In re Wendy N. WILLIAMS, Debtor.

Wendy N. Williams, Plaintiff,

v.

EFG Tech/Rutgers, et als, Defendants.

Bankruptcy No. 01–50360 (RTL).
Adversary No. 01–05345.

United States Bankruptcy Court,
D. New Jersey.

July 25, 2003.

James B. Brown, Jr., Esq., Shore & Zahn, Esqs., for Plaintiff/Debtor.

Christopher J. Christie, Esq., United States Attorney, Anthony J. LaBruna, Jr., Esq., Assistant United States Attorney, for Defendant, U.S. Department of Education, William D. Ford Direct Loan Program.

**OPINION**

RAYMOND T. LYONS, Bankruptcy Judge.

On motion of the Debtor, Wendy N. Williams, the court reopened her chapter 7 case so she could file a complaint to determine the dischargeability of student loan debts. All but one of the defendants did not contest nondischargeability of her student loans. Ms. Williams seeks a determination of dischargeability of student loans held by The United States Department of Education, William D. Ford Federal Direct Loan Program in excess of $50,000.

Following trial, the court finds that the debt is dischargeable under 11 U.S.C. § 523(a)(8) since Ms. Williams's medical conditions prevent her from earning an income, her medical conditions will persist for the foreseeable future, and she has made a good faith effort to deal with her student loans.

### I. Findings of Fact

Wendy N. Williams is an intelligent, articulate, accomplished 33–year–old woman. She is a public education success story having graduated from Middlesex County College, Kean University, and Rutgers University. Government sponsored student loans made her achievements possible and she wishes that she could repay these loans.

Between 1995 and 1998, Ms. Williams took out the following loans from the William D. Ford Direct Loan Program ("Ford Loans") to finance her graduate education:

| Date | Educational Institution | Amount |
|------|------------------------|--------|
| • 12/15/95 | Kean College [1] | $ 1,500 |

---

1. This loan for Kean College at the end of 1995 is curious since Ms. Williams received her bachelor's degree from Kean in 1993. The court assumes that this loan was related to her masters program at Rutgers. Perhaps Ms. Williams needed some additional undergraduate courses for admission to Rutgers.

- 7/29/96   Rutgers University   $ 8,500
- 7/29/96   Rutgers University   $ 7,100
- 2/12/97   Rutgers University   $ 2,190
- 5/29/97   Rutgers University   $ 8,500
- 1/13/98   Rutgers University   $ 4,856
- 1/13/98   Rutgers University   $ 2,895
- 4/15/98   Rutgers University   $ 3,000
- 7/8/98   Rutgers University   $ 8,500
- 7/8/98   Rutgers University   $ 8,350

**TOTAL**      **$55,391**

Unfortunately, Ms. Williams was born with a defective bladder. She has dealt with bladder infections since childhood. She has never been able to urinate and has catheterized herself 12 times a day her whole life. The catheterization process, no matter how carefully performed, inevitably leads to bladder infections. The bladder infections induce excruciating pain, high blood pressure, chills, vomiting, loss of sleep and appetite, and hospital visits of two-to-five days, once or twice a month to control the infection. A serious consequence of the frequent bladder infections has been kidney damage.

In 1987, Ms. Williams was informed that only one kidney functioned and advised that she would likely one day need dialysis. Despite her health problems, Ms. Williams persevered and attained an Associate degree from Middlesex County College in 1992, and then a Bachelor's of Arts degree in Sociology from Kean University in 1993. From 1994 to 1996, she worked at Catholic Charities. She left Catholic Charities in September 1996 to attended Rutgers University full-time (4 to 5 classes a semester), where she sought a Master's degree in Social Work (MSW). During her graduate program, she did not work. No payments were due on her Ford Loans while she was in graduate school.

Only a few months into her graduate program, Ms. Williams became ill. In January 1997, she was treated at Raritan Bay Medical Center and diagnosed with: (1) chronic end-stage renal disease (kidney failure); (2) severe anemia; and (3) pyelonephritis (kidney infection). With no job and no insurance, Ms. Williams qualified for Social Security income of $585.00 a month and Medicaid. Later that month, Ms. Williams elected to pursue peritoneal dialysis as an out-patient. A Tenchkoff catheter was inserted and a urine bag attached to her right leg. She spent nine to ten hours a night hooked-up to a dialysis machine at home. On April 3, 1997, she became eligible for Social Security disability income and Medicare benefits.

While attending Rutgers, medical problems persisted, including continued dialysis and hernia surgery. In January 1999, her right kidney failed and was removed, soon followed by her left kidney in February 1999. On April 20, 1999, she underwent transplant surgery on her right side with a kidney donated by her brother. The periteneal dialysis tubes were removed after the kidney began working.

Due to her medical conditions, she missed many classes. This led to the forfeiture of $10,000.00 in tuition and an investigation by Rutgers for possible expulsion. Arrangements were made for her to study from home her last two semesters. In May 2000, Ms. Williams received her Master's in Social Work from Rutgers.

Ms. Williams was the victim of a car accident. At the end of 2000, she was hit by a woman speaking on her cell phone who ran a red light. The incident damaged her right side from shoulder to leg and produced kidney bleeding.

No longer a student, unemployed, and in debt, Ms. Williams sought deferment for her educational loans. She provided her loan servicer with all necessary paperwork and was granted a deferment on her educational loans prior to the date of her first payment. Shortly thereafter, she filed a chapter 7 petition on January 7, 2001.

She owns no real estate and only minimal personal property valued at $425.00. Her potential personal injury claim from the auto accident was scheduled at an unknown value. The trustee submitted a no asset report. On April 9, 2001, this court entered an order discharging the debtor pursuant to 11 U.S.C. § 727 and a final decree closing the case. Notably, Ms. Williams did not request a determination that her student loans were nondischargeable prior to her case being closed.

On February 13, 2001, Ms. Williams began a job as a social worker for the New Jersey Juvenile Justice Commission at a maximum security prison in Mortontown, receiving a take home pay every two weeks of about $1,000.00. She worked five days a week, eight hours a day. The job required a 90–minute, round-trip commute from her home in Piscateway to Mortontown. Her doctor advised against the job because a commute longer than 50 minutes could restrict blood-flow and cause higher blood pressure, migraines, as well as increase stress on her immune system. However, Ms. Williams took the job because she (1) could not find work within 25 minutes of her home and (2) wanted to begin paying off her debts. She did not consider moving or living alone due to her medical condition. By taking a job, Ms. Williams no longer qualified for disability benefits.

On July 2, 2001, upon motion of Ms. Williams, this court ordered that her case be reopened so that she could file a complaint to determine the dischargeability of her student loans. Since the motion, the following events have occurred: (1) in September 2001, she was the victim of a second car accident (struck while a pedestrian); (2) in January 2002, Ms. Williams had surgery to enlarge her bladder; (3) on May 17, 2002, after 16 months of constant infections, lost work time, increased stress, higher blood pressure, and her doctor's recommendation that she stop working, Ms. Williams left her job as a social worker with the New Jersey Juvenile Justice Commission; (4) in August 2002, Ms. Williams was diagnosed with food allergies; and (5) in late 2002, she was diagnosed with osteoporosis, which her doctor attributed to one of her kidney prescriptions, Petizon, a steroid known to deplete bone. (Upon doctor's instructions, she exercises regularly at a gym to strengthen her back and control her arching spine).

Currently, she visits her doctor once, sometime twice a month, and self-catheterizes 12 times a day. The constant catheterization causes bacteria to accumulate in her bladder continuing her cycle of infections. These infections have twice caused kidney rejections. Although she takes 35 to 40 pills a day and antibiotics one to two times a month, the bacteria still persists.

Ms. Williams receives $971.00 a month from Social Security Disability income. To cut down on costs, she lives with her mother. She has no dependents, no spouse, owns no real property, and only owns minimal personal property. Her minimum monthly expenses for basic necessities include: $350 rent; $150 for utilities (gas electric and phone); $100 for food; $60 for prescription; and $54 Medicare premium. She also pays a small undetermined sum to her father for use of his car to go to the doctor and the gym.

Ms. Williams qualifies for New Jersey Pharmaceutical Assistance to the Aged & Disabled (NJ PAAD), which provides her

prescriptions with a $5.00 co-pay. Medicare pays for 80 percent of any medical treatment or costs, leaving her to pay 20 percent. Included in these costs are monthly medical supplies for catheterization due to her defective bladder: 300 sterile catheters, 300 gloves, 300 sanitary wipes. Ms. Williams estimates the medical supplies cost about $2,500 a month, or $500 month after Medicare. Other unforeseen necessary expenses, such as anti-rejection medicine if Ms. Williams's kidney were to shut down (as has happened twice since her transplant), cost $15,000, leaving her a bill of 20 percent or $3,000 after Medicare.

## II. Discussion

### A. Jurisdiction—28 U.S.C. §§ 1334, 157(a), (b)

This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334, 157(a) and (b), and the Standing Order of Reference from the United States District Court for the District of New Jersey dated July 23, 1984, referring all proceedings arising under Title 11. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) dealing with dischargeability.

### B. Exception to Discharge— § 523(a)(8)

Courts have generally construed exceptions to discharge contained in § 523 narrowly against the creditor and in favor of the debtor in order to carry out the rehabilitative fresh start policy of the Bankruptcy Code. See, In re Pelkowski, 990 F.2d 737 (3d Cir.1993).

§ 523. Exceptions to discharge.

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents;

The term "undue hardship" is not defined in § 523(a)(8). Thus the definition is left for judicial interpretation. See, In re Rivera, 284 B.R. 88 at 90 (Bankr.D.N.J. 2002), citing, Brightful v. Pennsylvania Higher Education Assistance Assoc., [PHEAA] (In re Brightful), 267 F.3d 324 (3d Cir.2001). The Third Circuit in PHEAA v. Faish (In re Faish), 72 F.3d 298 (3d Cir.1995), adopted the Second Circuit's "Brunner" test for determining undue hardship. See, Brunner v. New York State Higher Educ. Services Corp., 831 F.2d 395 (2d Cir.1987).

■ The Brunner test for undue hardship requires a three-part showing that: (1) the debtor cannot maintain, based on current income and expenses, a minimal standard of living for herself and her dependents if forced to repay the loans; (2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period for student loans; and (3) the debtor has made good faith efforts to repay the loans. See, Brightful, at 327; Faish, at 306.

■ Ms. Williams has the burden of establishing each element of this test by a preponderance of the evidence. See, Faish, at 306; see also, Grogan v. Garner, 498 U.S. 279 at 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (holding that "the standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the ordinary preponderance-of-the-evidence standard"). If one of the elements of the

test is not proven, the inquiry must end, and the student loans cannot be discharged. *Faish,* at 306.[2]

### 1. Debtor Cannot Maintain a Minimum Standard of Living If the Loans Are Not Discharged.

The first prong of the Brunner test asks whether Ms. Williams can maintain a minimum standard of living if forced to repay these loans. A debtor's extremely low income, compared with the cost of basic necessities, establishes that a debtor is unable to maintain a minimal standard of living if forced to repay the obligations. *See, N.J. Higher Education Assistance Authority v. Zierden–Landmesser (In re Zierden–Landmesser),* 249 B.R. 65 (M.D.Pa.2000).

Ms. Williams's income is $971 a month and her total expenses for basic necessities are $714.00, leaving her a surplus of $257.00 a month. It is apparent that Ms. Williams is barely getting by and cannot maintain a minimum standard of living if forced to repay these loans. The $257.00 a month surplus income is an extremely paltry sum that does not even cover the $500.00 in basic medical supplies for her catheterization, let alone other basic necessities, such as transportation costs when using her father's vehicle or clothing. Thus, requiring Ms. Williams to add a loan payment to her expenses would be futile. Ms. Williams has met the first prong of the Brunner test.

### 2. Debtor's Financial and Medical Conditions Will Likely Persist Into the Future.

The second prong of the Brunner test asks if additional circumstances exist such that the undue hardship will likely persist. *See, Goulet v. Educational Credit Management Corp.,* 284 F.3d 773 at 778 (7th Cir.2002), *quoting, In re Roberson,* 999 F.2d 1132 at 1136 (7th Cir.1993) ("Dischargeability of student loans should be based upon the certainty of hopelessness, not simply a present inability to fulfill financial commitment."). These circumstances need to be detailed and not based on assumptions. *See, Brightful,* 267 F.3d 324 at 330. Specifically, is there a likelihood that Ms. Williams's financial and medical condition will improve?

The Third Circuit noted that a well-educated individual, with no dependents should be able to find work, whether in the chosen field or not, that would permit the individual to repay her loans. *See, Faish,* 72 F.3d 298 at 307. Ms. Williams is well-educated and has no dependents. However, physically, Ms. Williams's medical condition will not permit her to work. Ms. Williams made attempts to find work and gained an entry-level job in her field of study. During her 16–month employment, she endured a 90–minute, round-trip commute that increased her blood pressure and caused migraine headaches. Ms. Williams missed countless days due to bladder infections and two bouts with kidney rejection. The last rejection took place in January 2002. Ms. Williams testified that it is quite possible she may incur another kidney rejection. In addition, if her kidney stops, she will be forced to resume dialysis, further decreasing both her financial and medical condition.

There is no cure for Ms. Williams's defective bladder. She underwent bladder augmentation, but that has not solved her problem. She actually needs a new bladder, but bladder transplantation is not possible. Ms. Williams is doomed to a life of

---

**2.** *See generally, In re Segal,* 57 F.3d 342, 346–347 (3d Cir.1995) (comprehensively describing the development of § 523(a)(8)).

catheterization, bladder infections, kidney damage, daily medication and frequent hospitalizations. Her doctor opined that she is totally and permanently disabled and will be for the rest of her life. In addition, she is dependent on government programs for meager income, insufficient to support independent living, but also for medical care and medication. Should Ms. Williams accept employment against her doctor's advice, she would forego her government medical treatment and medication. Few, if any, employers provide health benefits comparable to the federal and state programs available to Ms. Williams so long as she cannot work. To go to work in the field of her training (social work) would be a financial disaster. It does not appear that Ms. Williams's condition, financially or medically, will improve to allow the her to return to work. Therefore, the second prong of the Brunner test is met.

### 3. Debtor Made a Good Faith Effort to Repay the Loans.

Under the final prong of the Brunner test, the court considers whether the debtor made a good faith effort to repay her obligations. The good faith prong of the Brunner test fulfills Congress's purpose to reign in the "rising incidence of consumer bankruptcies of former students motivated primarily to avoid payment of education loan debts." *See, In re Pena,* 155 F.3d 1108 at 1111 (9th Cir.1998), *quoting* the Report of the Commission on the Bankruptcy Laws of the United States, House Doc. No. 93–137, Pt. I, 93d Cong., 1st Sess. (1973) at 140 n. 14.

■■■ Good faith requires that the debtor's poor financial condition and default were not caused by the debtor's own willfulness or negligence, but rather by

factors beyond the debtor's control. *See, Faish,* 72 F.3d 298 at 305.[3] Further, the debtor must not have ignored her obligations and must have dealt with her student loans through repayment, deferral or restructuring. *See, In re Pena,* at 1111, and *Nary v. The Complete Source, et al.,* 253 B.R. 752, 768 (N.D.Tex.2000), *quoting, In re Brown,* 239 B.R. 204 at 209 (S.D.Cal. 1999) ("A lack of payment does not by itself preclude a good faith finding.").

■■■ In Ms. Williams's case, to answer the question of whether she acted in good faith toward repaying her student loans, this court must determine whether: (1) her bad financial condition was incurred through purposeful or negligent conduct or rather by factors beyond her control; and (2) she made efforts to effectively manage her repayment obligations.

### a. Undue Hardship Was Caused By Factors Beyond the Debtor's Control.

Ms. Williams is a highly-educated, young woman who understood that the loans she was receiving were not free. In fact, directly above her signature, in all caps, on each of the promissory notes is the affirmative sentence, "I UNDERSTAND THAT THIS IS A FEDERAL LOAN THAT I MUST REPAY." When Ms. Williams began her Master's degree program she did not know that her medical condition would severely deteriorate to its present state. When she began her degree she had both kidneys. Also, Ms. Williams did not know of the end-stage renal disease until a few months into her Master's program. Nevertheless, she persisted with her education even through the medical adversity of dialysis, a hernia, hav-

---

**3.** *See also,* 4 COLLIER ON BANKRUPTCY, P 523.14[2] (15th ed. rev.2003) ("Therefore, if the debtor has not made payments on the loans because, through no fault of the debtor, he or she has never had the ability to pay, the *good faith effort test is met.*")

ing both kidneys removed, a kidney transplant, and side-effects from medication.

Although receiving Social Security, Medicare and NJ PAAD assistance, still in great physical and mental distress with her condition, and against her doctor's advice, Ms. Williams obtained employment with the State of New Jersey for more than a year so that she could be a productive member of society, or as she testified, "pay her bills." A few months before, as well as during her employment, Ms. Williams was the victim of two automobile accidents, suffering head to foot injuries that exacerbated her condition. Her physical condition continued to deteriorate, having bouts with infections and the other maladies that accompany infections—fatigue, loss of appetite and excruciating pain. In sum, her condition did not allow her to continue work. Therefore, Ms. Williams's bad financial condition was not caused by her own willfulness or negligence, but by a variety of unanticipated health problems and life events beyond her control.

### b. Proper Management of Debtor's Loans Demonstrates Good Faith.

Generally, courts have held good faith exists when the debtor manages financial affairs, rather than running away from responsibilities in the hopes of obtaining a blanket discharge. In this district, a bankruptcy court held that a debtor met the good faith standard because the debtor made: (1) monthly loan payments when they became due six months after graduation; (2) timely payments for 11 months; and (3) attempts to seek and maintain a job despite disabilities, which include chronic asthma, memory loss, panic attacks, depression and multiple personality

disorder. *See, In re Rivera,* 284 B.R. 88 at 92. The Ninth Circuit held good faith was met when the debtor: (1) made some payments on loans; and (2) obtained a deferment prior to filing the bankruptcy. *See, In re Pena,* 155 F.3d 1108 at 1114. The Sixth Circuit found good faith where the debtor: (1) made minimal payments on loans several years after loans became due and at least a year before filing for bankruptcy; and (2) chose to work in a worthwhile, albeit low paying profession. *See, In re Cheesman,* 25 F.3d 356, 360 (6th Cir.1994). Whereas the Second Circuit concluded the debtor did not make a good faith attempt when the debtor: (1) filed to discharge of her loans within a month of the date of the first payment of the loans; and (2) did so without requesting deferment of payment. *See, Brunner,* 831 F.2d 395 at 397.

In addition to the debtor's student loan payments, courts must also examine the debtor's efforts to negotiate deferments with applicable student loan agencies. *See, United States Dep't of Educ. v. Wallace (In re Wallace),* 259 B.R. 170 (C.D.Cal.2000), *quoting, Matter of Sands,* 166 B.R. 299, 311 (Bankr.W.D.Mich.1994). Deferment is "The act of delaying, postponement."[4] Deferment is a remedy available to those unable to pay obligations because of prolonged unemployment. *See, Brunner,* at 397.

Although Ms. Williams never made any payments on her Ford Loans, she responsibly handled her loans. Ms. Williams, who graduated with her Master's degree in May 2000, testified that she sought deferment prior to both the date of her first payment and the filing of her bankruptcy petition.[5]

---

4. *See,* BLACK'S LAW DICTIONARY at 432 (7th ed.1999).

5. The only evidence regarding deferment came from the debtor's testimony that the court accepts as accurate. No documentary

Ms. Williams testified that to receive a deferment, she was required to: (1) contact the loan holder to acknowledge her debt and ask for a deferment in writing; (2) provide detailed documentation of her inability to work due to her illness, including proof of Medicare and Social Security assistance, and on a subsequent request for deferment a letter from her physician, dated March 15, 2002, that indicated her "permanent handicap"; and (3) await the loan servicers' approval. On cross examination by the United States Attorney, Ms. Williams testified that she maintained her deferment status through continual written requests, which were granted each and every time.

Trying to get back on her feet, Ms. Williams took a job with the State of New Jersey. As this court previously recounted, Ms. Williams's 16–month work history was peppered with bouts of infections, hospital visits, and lost work time. Still obligated to pay her debt, the continual deferments effectively postponed the date of the first payment throughout this period. No payments were due or sought while on deferment, although she resumed employment. Further, the deferments negated the need to pursue other possible alternatives to managing the student loan debt, such as consolidation or timely payments because the due date never manifested. This court finds that continuing deferment was a responsible act, since Ms. Williams could not determine if her severe condition would ever subside and allow her the ability to repay her loans.

Ms. Williams did not seek a discharge of her student loans when she first filed bankruptcy on January 7, 2001, nor prior to her discharge and the closing of her case on April 9, 2001. In the interim, she took a job against her doctor's advice on February 13, 2001, then sought to reopen

her bankruptcy case for a determination of dischargeability on July 2, 2001. Subsequently, Ms. Williams was forced to give up her job by overwhelming medical problems.

Ms. Williams has made a good faith effort to repay her loans. She acknowledged her debt, was forthcoming with both her creditors and the court, and responsibly managed her loans by exercising the deferment option both before her first payment was due and the bankruptcy petition was filed. Further, she continued to seek employment, but was forced to quit due to her debilatating medical condition. Clearly, the Congressional intent for good faith as embodied in § 523(a)(8) was met. Thus, the court finds that Ms. Williams met the final prong of the *Brunner* test.

### III. Conclusion

Ms. Williams has endured a Biblical Job-like plight, including the loss of both kidneys, kidney transplant surgery, kidney rejection, anemia and osteoporosis, daily painful bladder infections, and twice being the victim of car accidents. Yet, Ms. Williams persevered, received her education, tried to managed her obligations through the deferment option, and, sought and secured employment.

The United States Department of Education provides low cost loans so people may obtain education and contribute to society. These loans are not free; rather the taking of a loan obligates the student to repay that money plus interest at a future date. Although the bankruptcy system is not to be used to avoid student loans when possible options of repayment exist, Congress enacted § 523(a)(8) to deal with circumstances that emerge when a debtor needs a discharge from student loans due to undue hardship.

evidence of deferment, nor any evidence in-

consistent with the testimony was provided.

Ms. Williams has met the three-prong *Brunner* undue hardship test used by the Third Circuit. Despite the advances in modern medicine, there is no procedure to transplant a new bladder. In addition, Ms. Williams's income barely meets her expenses. Practically speaking, Ms. Williams will never be able repay her student loans. Finally, she has demonstrated good faith in that her poor financial condition was caused by factors beyond her control and she properly dealt with her obligations by using the deferment option and seeking employment.

Therefore, judgment shall be entered determining the debt to the U.S. Department of Education is dischargeable.