In re Larry C. WILLIAMS & Sharon E. Williams, Debtors.

Larry C. Williams & Sharon E. Williams, Plaintiffs,

v.

Educational Credit Management Corporation, Defendant.

Bankruptcy No. 01–55232–ASW. Adversary No. 02–5017.

United States Bankruptcy Court, N.D. California.

Oct. 2, 2003.

Laurence J. McEvoy, Law Offices of Clayton and McEvoy, San Jose, CA, for debtor.

Miriam E. Hiser, Law Offices of Miriam E. Hiser, San Francisco, CA, for defendant.

Douglas K. Chang, Office of the U.S. Attorney, San Francisco, CA, U.S. Trustee.

## MEMORANDUM DECISION DETERMINING DEBTS TO BE DISCHARGEABLE

ARTHUR S. WEISSBRODT, Bankruptcy Judge.

Before the Court is an amended complaint by Larry Williams ("Husband") and Sharon Williams ("Wife"), who are the debtors in this Chapter 7[1] case (collectively, "Debtors"). The complaint is against Educational Credit Management Corporation ("Creditor")[2] and seeks a determination that debts owed to Creditor for student loans taken by each of the Debtors are dischargeable in bankruptcy under § 523(a)(8), on the basis that payment of such debts would pose undue hardship.

---

1. Unless otherwise noted, all statutory references are to Title 11, United States Code ("Bankruptcy Code"), as applicable to cases commenced on October 26, 2001.

2. The complaint originally included three more defendants: Citibank (New York State), NA; USA Education, Inc.; and Student Loan Marketing Association. It was amended April 22, 2002 to omit those three defendants and add the United States Department of Health and Human Services as a defendant; on June 28, 2002, the amended complaint was dismissed as to that defendant by stipulation.

The Debtors are represented by Laurence J. McEvoy, Esq. of Clayton & McEvoy, P.C. Creditor is represented by Miriam Hiser, Esq. of the Law Offices of Miriam Hiser. The matter has been tried and submitted for decision after post-trial briefing. This Memorandum Decision constitutes the Court's findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## I.

### FACTS

The Debtors filed a joint petition under Chapter 7 on October 26, 2001 and received a discharge of all dischargeable debts on January 22, 2002.

Husband was born in 1949 and Wife was born in 1950; they have been married since 1978. They are both licensed chiropractors and operate their own practice in San Jose.

After high school, Husband entered the Marine Corps, where he handled communications. He was discharged from the military in 1971 and worked at a variety of jobs while studying for an electronics engineering degree at several junior colleges from 1972 through 1980. During that period, he was employed as an electronics research and development engineering technician, a personnel and placement counselor, and a sales representative. He decided to change fields and enrolled at Palmer Chiropractic College ("Palmer"), graduating in 1984. He then worked as an examination doctor for a chiropractic practice until receiving his license in 1985, when he joined the practice as an associate chiropractor. He established his own practice in 1986 and has operated it since that time, incorporating it in November 2000 on the advice of his accountant.

Wife graduated from high school in 1969 and attended several junior colleges until 1976. She transferred to Sacramento State University in 1976, then to San Jose State University in 1978. In 1981, she enrolled at Palmer but was unable to complete the course and stayed only one and a half semesters. In 1986, she graduated from San Jose State University with a bachelor's degree in psychology. She returned to Palmer in October 1986 and graduated in 1989. She became licensed in 1991 and has practiced with Husband since that time. Wife did secretarial and clerical work for several employers from 1970 to 1987, and she also did office work at Husband's practice without pay.

Husband testified that, while "generally I feel fairly healthy", he does have "musculoskeletal problems, degenerative neck problems, left shoulder dysfunctional problems, [and] lower back problems". He said that these conditions cause some pain and weakness, which require chiropractic and physical therapy treatment "just about daily"—medical treatment is available under his health insurance plan but he has not sought it because he does not believe that it "really [has] a whole lot to offer" for these conditions at their current stages. Husband testified that these ailments "occasionally" interfere with his ability to work, sometimes for as much as "a few days", and up to a week on "a few occasions over the years", but preventive measures and the "conservative treatment" he receives do enable him to work productively for eight hours a day "most of the time". Husband stated that chiropractic work is "very prone" to cause "repetitive trauma or stress type injuries", due to "a lot of bending, manual work, leaning over quite a bit, [and] types of thrust involved", such that there is a "high disability rate in the profession". He said that "it seems to be rare" for chiropractors to practice beyond the age of 60 due to the physical demands

of the work, and he knows of only one who is older than he is and still practicing.

Husband testified that Debtors' practice has the capacity of seeing approximately 100 patients per week, but the patient load dropped from that level during the "last year or so" to about 75 per week—the week before trial, 92 patients were seen. He said that the practice depends largely on referrals because that generates the "best type of case and the most repeat business"; developing referrals requires providing a "very high level of service" relative to the fee charged. The practice also performs two annual promotions with mailings and certificates that offer a "dramatically reduced entry cost", and maintains an advertisement in the telephone directory. Husband testified that he does not attempt to generate business by such means as appearing at "storefronts" or sporting events to offer free "screenings", since he is "absolutely terrible at actively promoting myself" and has been unsuccessful as a salesman in the past because "it doesn't work for me". Debtors did acquire the practice of a retiring chiropractor in 2002, under an agreement whereby 50% of fees received from that practice's patients were turned over to the retired chiropractor for one year. Husband said that Debtors did not expect to earn "a great deal of money" from those new patients, but "we were trying to expand our referral base for the future", and he estimated that "it might work out to be maybe about a 10% increase over what we were doing before". Husband testified that, when he began practicing, chiropractic practices typically could be sold for a price equal to twice the annual gross receipts, but it is now "very difficult" to sell one at all—he said that he knew of seven chiropractors who wanted to retire and tried for over a year to sell practices that were fifteen to twenty-five years old, but "finally just closed the doors and walked away". Husband testified that Debtors' practice is located in an office building in west San Jose, and requires equipment that must be replaced from time to time. He said that a "primary concern" now is sixteen year old x-ray equipment that will have to be replaced and could cost "about $30,000".

Husband testified that the business aspect of a chiropractic practice has "changed a lot" since he graduated from Palmer, for various reasons. One cause is a general trend toward "managed care" insurance, under which "quite a restriction" was imposed on coverage for chiropractic services—Husband said that most plans now do not cover such services at all, and the rest provide only limited coverage. Another cause was "significant" reform of the workers' compensation system in 1994. Husband testified that he "was looking around" for ways to increase income and had just become qualified as a medical evaluator to examine patients in connection with disability claims and dispute resolution; but the "big changes" permitted fewer patients to receive evaluations and caused the "fee structure" to be "pretty much cut in half". Husband also referred to what he described as a "potential situation", in that physical therapists are now seeking the status of "primary care providers" authorized to perform spinal manipulations; if the State confers that status, "it will bring a lot of competition into our niche in the market". Those specific problems followed what Husband characterized as a general "recession" and "economic downturn" commencing in 1990 and lasting for two to three years. He said that he had "pretty much built my practice" from people he knew at three or four large electronics firms, and it "hit my practice particularly hard" when one of them went out of business. Furthermore, Husband testified, "a general down economy" in the

past three years has now caused "a lot of layoffs", resulting in loss of insurance benefits for those people. In order to adjust to the reduced availability of insurance coverage for chiropractic services, Husband said that Debtors' practice has had to attract and maintain a larger share of "personal paying patients" (*i.e.*, those who do not rely upon insurance coverage to pay the fees), which means that "you have to keep the prices low". Husband testified that, when he began practicing in 1984, the standard fee for a basic office visit was $39, whereas Debtors now charge "about $40" (with a $5 discount for those who pay at the time of the service), "and that's pretty much what the market will bear".

Husband estimated that Debtors' adjusted gross income for 2002 would be "around" $101,000, although their tax returns had not yet been prepared for that year. The parties stipulated that Debtors' tax returns showed the following adjusted gross income for the years 1997 through 2001:

```
1997:   $ 80,757
1998:   $ 92,567
1999:   $107,226
2000:   $111,876
2001:   $ 89,542
```

Husband testified that 1999 and 2000 were Debtors' "most lucrative years" since they had become chiropractors, "boom years for everyone, I think". He calculated Debtors' monthly earnings for the period from 1997 to the date of trial in 2003 as follows:

```
1997:   $6,511 gross—$4,193 net
1998:   $7,565 gross—$3,726 net
1999:   $8,742 gross—$4,744 net
2000:   $9,171 gross—$5,739 net
2001:   $6,500 gross—$4,798 net
2002:   $6,500 gross—$4,771 net
2003:   $6,500 gross—$4,771 net
```

In addition to those earnings, Husband said that Debtors receive monthly income from two assets inherited by Wife: approximately $140 from a mortgage that "will run about another ten years", and approximately $42 from gas well royalties that "should be ongoing". Husband testified that Debtors' corporation paid $17,000 in 2002 to the retired chiropractor whose practice Debtors had acquired, and that such payments would cease after May 2003. Debtors both testified that they have worked only as chiropractors since graduating from Palmer, have not looked for other employment, and do not intend to do so. Wife testified that she was aware of no other field in which she was qualified where she could earn more than she does as a chiropractor. Although Wife has a bachelor's degree in psychology, she said that she was never employed as a psychologist and understood that such positions require at least a master's degree, with some requiring a doctorate. Husband testified that his highest average gross monthly income before becoming a licensed chiropractor was $2,500. Husband said that, other than Wife's inherited mortgage and royalties, Debtors' only investments are two additional inheritances of hers: 45 shares of stock that were worth "$2 and something per share last time I checked"; and a fractional interest in a "small piece" of unimproved rural land in Oklahoma, which had an assessed value of $50 approximately fifteen years ago. Husband stated that Debtors have no assets of "significant value", no real property other than the $50 Oklahoma parcel, no savings or pension plan, and no disability insurance.

Husband testified that Debtors' monthly expenses (exclusive of student loan payments) total $4,647.34, as follows:

| | |
|---|---|
| Rent | $2,050.00 |
| Home maintenance and repair | $ 23.43 |
| Miscellaneous household | $ 77.91 |
| Groceries and sundries | $ 822.00 |
| Electricity and gas | $ 167.00 |
| Water | $ 47.75 |
| Telephone | $ 22.77 |
| Cable | $ 44.25 |
| Newspaper | $ 16.42 |
| Trash | $ 16.40 |

| | |
|---|---|
| Clothing | $ 73.31 |
| Medical | $ 132.51 |
| Dental | $ 312.50 |
| Auto operation and repair | $ 251.87 |
| Recreation and entertainment | $ 24.66 |
| Outside meals and takeout | $ 35.85 |
| Renters' insurance | $ 31.67 |
| Auto insurance | $ 92.00 |
| Bank fees | $ 13.00 |
| Son's health insurance and expense | $ 106.58 |
| Auto loan payment | $ 246.31 |
| Miscellaneous personal | $ 36.15 |

With respect to the rent expense, Husband testified that Debtors have rented a three bedroom house near their practice for twenty-four years, under a "kind of gentleman's agreement lease". He said that Debtors "get along with the landlord pretty well" and "pretty much take care of" the house, doing "general maintenance" and projects that are not "major expenses", such as small plumbing jobs, lock repairs, etc. Husband testified that Debtors have not looked for less expensive housing and do not intend to do so, because he "would doubt very seriously" that they could find "a livable situation" in the San Jose area for less. He said that he deals with "an awful lot of people who talk to me all the time about the difficulty of finding affordable housing" with even apartments costing $1,800 to $1,850 a month, so Debtors' rent "seems the best I hear of anyone doing" and the expense of moving would be "prohibitive at this time". As for the dental expense, Husband testified that it is not being incurred now but Debtors' dentist has told them that old fillings are "degenerating" and must be covered by new crowns (four for Husband and six for Wife) at a cost of $750 apiece; Debtors have amortized that total over a two year period. He said that Debtors have no dental insurance, though their corporation does provide them with health insurance to cover 75% of office visit charges with a $450 deductible for brand name prescriptions (and a smaller deduct-

ible for other prescriptions). With respect to the automobile expenses, Husband testified that those do not reflect corporate reimbursement of 36.5¢ per mile for business travel, which averaged approximately $166 per month in 2002. He said that Debtors own two cars: a 1988 Buick Le Sabre with 103,000 miles that "requires a lot of repair"; and a 1999 Toyota Camry purchased in February 2003, for which loan payments will end in February 2008. Husband acknowledged that, since Debtors work together, they could "sometimes" use a single car to travel to and from work. Husband said that the expense for the son included $61.50 for health insurance premiums, with the balance representing an average of what Debtors have spent in the past on other costs such as emergency dental work; Debtors consider it more economical to pay for the son's insurance than to cover his medical bills. Husband stated that the son is twenty-seven years old and in training as a personnel counselor with "not very much income", but is not Debtors' "legal dependent". With respect to the expense for groceries and sundries, Husband testified that it includes items in addition to food, such as supplies for cleaning and grooming.

In addition to the foregoing expenses, Debtors currently pay $400 per month for Wife's loan from the United States Department of Health and Human Services ("HHS"), which is a "health education assistance loan" ("HEAL Loan") made pursuant to 42 U.S.C. § 292 *et seq.* The parties stipulate that the Heal Loan bears interest at the rate of 4.875%, and the balance of principal plus interest on December 2, 2002 was $95,315.28. The Heal Loan is not dischargeable in this bankruptcy case pursuant to § 292f(g)(1), because it became due less than seven years prior to the petition filing date.[3] Husband testified

---

3. Three prerequisites to discharge are created by § 292f(g), and the first is that the debt first

that the current monthly payment of $400 was negotiated after Debtors filed bankruptcy, to last for one year subject to review. He said "what they wanted to begin with" was $600 or $700 per month and that is the amount that he expects will be charged when HHS reviews the account.

The parties stipulate that the loans at issue in this Adversary Proceeding are those created by consolidation of previous loans into new loans ("New Loans"). In 1995, Husband consolidated loans into a New Loan under a promissory note with interest at the rate of 9%—the parties stipulate that the balance of principal and interest due on Husband's New Loan as of December 2, 2002 was $44,234.20. Husband testified that a total of $52,332.17 in payments was made on all of his student loans from July 21, 1982 through September 28, 2001, of which $23,346.75 was paid on the New Loan from January 11, 1996 through September 28, 2001. In 1993, Wife consolidated loans into a New Loan under a promissory note with interest at the rate of 9%—the parties stipulate that the balance of principal and interest due on Wife's New Loan as of December 2, 2002 was $123,210.79. At trial, Creditor's counsel contended that the stipulated total did not include statutory collection costs provided for by the note, and that the total with such collection costs was $154,013.49 as of March 27, 2003; Debtors presented no evidence of a different total.[4] Husband

testified that a total of $13,306,27 in payments was made on all of Wife's student loans (other than the HEAL Loan) from December 29, 1986 through February 14, 2001, of which $11,243.44 was paid on the New Loan from May 18,2000 through February 14, 2001; an additional $29,588.14 was paid on the HEAL Loan from September 17, 1986 through February 3, 2003.

Wife testified as follows about her efforts to make payments on her New Loan. She consolidated previous loans into the New Loan because she could not afford to make payments when the previous loans came due, and she understood that consolidation would give her additional time before commencing repayment. At time of trial, she was "not sure" that she had understood when consolidating that a new repayment period of from twenty-three to twenty-five years would be created, and "hindsight tells me I did not understand". Her last forbearance under the New Loan was granted orally in June 1998, to extend through March 1999; when that expired, she received a notice that monthly payments of $845 would be required. Wife could not afford that amount and asked what other options were available—she was told that no further forbearances were available and she could only "refinance" through the William D. Ford Program ("Ford Program") or seek a hardship deferment. Wife investigated the Ford Program but "understood" that it required a "loan fee" of 18% and carried a 14% inter-

became due within seven years before the bankruptcy case was filed (exclusive of any forbearances). The Heal Loan was made in May 1995 and the seven year period was extended two years, five months, and twenty-eight days by a total of five forbearance agreements. This bankruptcy case was filed in October 2001, which was less than seven years after the extended repayment date.

**4.** However, Debtors' counsel stated at trial that he was not willing to stipulate to Credi-

tor's total because Debtors did not want to be bound by that figure if the debt were determined to be non-dischargeable. Creditor's counsel replied that the purpose of this Adversary Proceeding initiated by Debtors was only to determine dischargeability and Creditor is not seeking a money judgment, so that Debtors would remain free to challenge the amount of the debt even if it were found to be non-dischargeable.

est rate, so she considered the hardship deferment the option that was applicable to her circumstances.[5] Wife applied for the hardship deferment by submitting "extensive" documents—she received a telephone call in December 1999, telling her that the deferment would end on March 28, 2000 and payments would have to begin at that time; but she was never explicitly told (orally or in writing) that the deferment had been granted. In the first week of April 2000, she received a form letter that the loan had been defaulted for nonpayment and she had not "been in touch with them". Wife "panicked" because she had believed that she had been granted a hardship deferment—she made "several" telephone calls daily (perhaps as many as thirty calls that month), wrote letters asking about the status and seeking administrative review, "begged for information about what happened", and "just knew there had to be a mistake". Despite Wife "contacting them regularly extensively in writing", she received "a lot" of calls and form letters saying that she had not tried to "contact them" or made efforts to repay, and that the loan would remain in default until she "contacted them". In May 2000, Wife "took it on myself to start making payments" because she "just felt it was so important to show good intentions", and sent a check for $1,000. In July 2000, she received a form letter stating that the account had been assigned to a collection agency and "he could send people to my home to check my records and seize property" if she did not immediately send a payment of $1,640, which she did. The collection agency also told her that she must pay $1,640 per month for six months in order to preserve her option to apply to the Ford Program. Wife did not understand or agree with the collection agency's

quoted balance of $62,000, but sent payments of $1,640 from August through December 2000, while continuing to ask for information and explanations. In January 2001, Wife received a letter saying that her requested administrative review had been completed, no error was found, and the loan remained in default due to lack of payments for 180 days; there was no mention of a hardship deferment or the several recent payments of $1,640, and Wife's "multiple, multiple phone calls" were not acknowledged. At that time, Wife had received no verification from the collection agency that her payments had been received or applied, and "decided to pretty much give up". She made two more payments of $200 each and "felt I had exhausted my finances". In April 2001, Wife received a letter stating that she had three options: consolidate through the Ford Program; or submit at least three "qualifying payments" that would permit consolidation through a different lender; or submit at least twelve "qualifying payments" that would permit her to participate in a "loan rehab program"—the letter did not refer to the payments made from May 2000 through February 2001, and Wife was "extremely frustrated", "had no more money to send to them", did not know what was happening to the payments that had been sent, and "felt defeated". Telephone calls from the collection agency eventually ceased, only to commence from "Ed Fund" (the servicing agent for the New Loan), the calling was "much worse, daily, multiple, including to my office"—Wife attempted to explain the problems to Ed Fund and furnished all requested financial information, but reached no solution. Commencing in 1999, Wife asked for accountings of her New Loan balance but never received

5. Creditor did not offer evidence on this point, but Creditor's attorney stated in argument that the Ford Program charges no "fee" to join, and Wife's collection costs would be reduced from a current 25% to 18.5% under the Ford Program.

a "meaningful response". When she was told that the loan was in default, she "couldn't accept" the reported balance of "somewhere around $107,000", then received another notice within a few weeks stating that the balance was "around $113,-000"—charges were made for such items as "miscellaneous fees" of $7,000 and $10,-000—"I asked where all these numbers came from, what's being added on". Wife's accountant told her that she needed a "statement" and she made a written request for one, but "was told they're not a bank and don't have to provide a statement", unlike "other financial institutions" with which she had dealt.

The parties agree that the Ford Program offers an "Income Contingent Repayment Plan", under which payments based on income would be made for a maximum of twenty-five years, with any unpaid balance forgiven at the end of that time. The parties also agree that debt forgiveness constitutes taxable income pursuant to 26 U.S.C. § 61(a)(12), unless the taxpayer is insolvent pursuant to 28 U.S.C. § 108(a)(1)(B).

## II.

### APPLICABLE LAW

Bankruptcy Code § 523(a)(8) provides that student loans such as the New Loans at issue here are excepted from a Chapter 7 bankruptcy discharge unless the debtor shows that "excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents". The Debtors claim that they would suffer undue hardship if the debt to Creditor had to be repaid.

■ The Code does not define "undue hardship", but the Ninth Circuit has adopted the three-part test of *In re Brunner*, 46 B.R. 752 (S.D.N.Y.1985), *aff'd*, 831 F.2d 395 (2nd Cir.1987) ("*Brunner*") to

determine whether "undue hardship" exists, *see In re Pena*, 155 F.3d 1108 (9th Cir.1998) ("*Pena*"). That test requires a debtor to prove each of the following:

First, the debtor must establish "that she cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependents if forced to repay the loans." [Citation omitted] . . . .

Second, the debtor must show "that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans." [Citation omitted] . . . .

The third prong requires "that the debtor has made good faith efforts to repay the loans . . . ." [Citation omitted] . . . .

*Pena*, at 1112.

■ When a debtor proves all three parts of the test and thus shows that undue hardship would result from having to pay the entire loan, it may nevertheless be the case that paying only part of the loan would not impose undue hardship. In that event, the loan can be partially discharged, *see In re Saxman*, 325 F.3d 1168, 1173–1174 (9th Cir.2003):

. . . once the debtor has satisfied the *Brunner* factors and the court has concluded that the debt is too great for the debtor to shoulder, § 523(a)(8) is silent with respect to whether the bankruptcy court may partially discharge the loan. Although § 523(a)(8) is the sole mechanism by which debtors may seek discharge of student debt, it is not the only provision bearing on the dischargeability of student loans. [¶] Following [*In re Myrvang*, 232 F.3d 1116 (9th Cir.2000)], it is now generally recognized that an all-or-nothing approach to the dischargeability of student debt contravenes Congress' intent in granting bankruptcy courts equitable authority to enforce the

provisions of the Bankruptcy Code. [footnote omitted] Under 11 U.S.C. § 105(a), bankruptcy courts may "issue any order, process or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. In [*In re Hornsby*, 144 F.3d 433 (6th Cir.1998) ("*Hornsby*")], the Sixth Circuit held that § 105(a) authorizes bankruptcy courts to enter partial discharges in student loan cases.

The Ninth Circuit endorsed *Hornsby's* application of § 105(a) to permit partial discharge, but disagreed with that case's failure to require a finding of undue hardship with respect to the discharged portion of a loan.

> We therefore conclude that before the bankruptcy court can partially discharge student debt pursuant to § 105(a), it must first find that the portion being discharged satisfies the requirements under § 523(a)(8).

*Saxman,* at 1175.

## III.

### ANALYSIS

#### A.   Minimal Standard of Living

■   The first prong of the *Brunner* test requires the Debtors to show that, based on current income and expenses, they cannot maintain a minimal standard of living if the debt to Creditor had to be repaid.

> To meet this requirement, the debtor must demonstrate more than simply tight finances. In defining undue hardship, courts require more than temporary financial adversity, but typically stop short of utter hopelessness. The proper inquiry is whether it would be

"unconscionable" to require the debtor to take steps to earn more income or reduce her expenses. *In re Nascimento,* 241 B.R. 440, 445 (9th Cir. BAP 1999) (citations omitted).

*In re Birrane,* 287 B.R. 490, 495 (9th Cir. BAP 2002) ("*Birrane*").

Debtors' net monthly earnings at time of trial were $4,771, which is consistent with their average net monthly earnings of $4,534 since 1997. They also received $182 per month from Wife's inherited mortgage and royalties—the parties agree that, after taxes, the additional net monthly income from those sources is $112, for a total net monthly income of $4,883.

Debtors' monthly expenses at time of trial totalled $5,047.34, of which $400 represents the amount currently being paid on Wife's HEAL Loan under a temporary one-year arrangement with HHS. Debtors' current expenses therefore exceed their current income by $164.34,[6] without any payments being made on the New Loans.

Creditor argues that the following items are not properly included among Debtors' current expenses:

■   First, Creditor notes that the dental expense of $312.50 is not actually being paid now and is merely a projected future expense, because it represents the monthly amount that would be required to pay $7,500 in charges that Debtors expect to incur over the next two years. However, Husband's unchallenged testimony was that Debtors suffer now from ten degenerating fillings that must be repaired at a cost of $750 each, so including this amount as a current expense reflects monthly savings to pay the cost of anticipated treatment for a current condition.

---

**6.**  Creditor argues that Debtors have a legal duty to "maximize" income and "minimize" expenses, but have not done either. Pursuant to *Birrane,* that issue will be directly addressed under the third prong of the *Brunner* test.

■ Second, Creditor notes that Debtors are not legally required to pay for the adult son's health care and argues that the $106.58 allocated to that purpose therefore should not be treated as one of Debtors' expenses. Creditor cites caselaw from other jurisdictions holding that a debtor's legally unnecessary payment of expenses for family members constitutes self-imposed hardship,[7] and Debtors do not argue otherwise, either factually or legally. This Court has found no support for the notion that a minimal standard of living under the first prong of the *Brunner* test should include voluntary assumption of non-dependent family members' expenses without a legal obligation to do so. Deducting the $106.58 expense for the son reduces total monthly expenses to $4,940.76.[8]

Creditor argues that certain expenses are unnecessary to a minimal standard of living. That term has not been defined by the Code or caselaw, there was no evidence at trial concerning local norms (whether minimal or otherwise), and the only evidence regarding the cost of living was Husband's testimony about rent. Creditor takes issue with the following expenses:

First, Creditor urges that Debtors do not require a three bedroom house for $2,050 and should move to something less expensive. However, Husband testified that he had heard that even apartments cost $1,800 to $1,850 and Debtors' rent "seems the best I hear of anyone doing", the cost of moving would be "prohibitive",

Debtors have a twenty-four year good relationship with their landlord, and they handle routine maintenance for the property. It may well be that Debtors are paying reduced rent in exchange for providing the landlord with stability and services, which probably would not be the case if they were to move. Moreover, there was no evidence that alternative housing was available at all, much less near Debtors' office (as their current home is) so as to avoid the expense of commuting longer distances. Assuming that Debtors were able to find other suitable housing, they would have to pay the cost of moving and that would presumably include a security deposit and some prepaid rent—Husband characterized that expense as "prohibitive"[9] and Debtors have no savings or other cash reserves with which to meet it.

Second, Creditor contends that Debtors do not require two automobiles because they work together, so the older car (which Husband testified needs "a lot of repair") should be sold to eliminate much of the $251.87 in auto operation and repair expense; and any remaining expense should be largely offset by the 36.5¢ per mile reimbursement that Debtors receive from their corporation. However, Husband testified that Debtors could travel to work together "sometimes", which implies that the second car is needed for that purpose the rest of the time.

Third, Creditor considers $822 for food to be excessive, especially when coupled

7. *In re Stebbins–Hopf,* 176 B.R. 784 (Bankr. W.D.Tex.1994); *In re Coveney,* 192 B.R. 140 (Bankr.W.D.Tex.1996); *In re Archibald,* 280 B.R. 222 (Bankr.S.D.Ind.2002); *In re Conner,* 89 B.R. 744 (Bankr.N.D.Ill.1988).

8. Even as so reduced, expenses still exceed monthly income by $57.76. As discussed below, the Court considers that Debtors' budget as adjusted to delete this expense reflects a minimal standard of living for them. Since

expenses exceed income, it follows that no part of the New Loans can be paid.

9. If the rent for an apartment were $1,800 as Husband testified he had heard, it would cost $5,400 to pay a typical security deposit equal to one month's rent plus prepaid rent for the first and last months' tenancy. The cost of moving Debtors' furniture and other belongings would be an additional expense.

with $77.91 for miscellaneous household expenses and $36.15 for miscellaneous personal expenses. However, Creditor's opinion is not supported by evidence that these amounts exceed some lower norm or represent purchase of luxuries rather than necessities.

Fourth, Creditor asserts that a minimal standard of living does not include cable television ($44.25), outside meals and takeout ($35.85), and newspaper ($16.42), so that each of those expenses should be eliminated.[10] Again, there is no evidence of a norm that excludes such items, although it is arguable that they may be optional and therefore unnecessary for a *minimal* standard of living. However, some of these expenses are similar to (and most are significantly less extreme than) the kind of expenses that were accepted by the Ninth Circuit in *In re Rifino*, 245 F.3d 1083 (9th Cir.2001) ("*Rifino*"):. tanning salon visits; cable television; new car payment; son's enrollment in private elementary school; son's Aikido, swimming, and skating lessons; and son's participation in Little League and cross country-CYO. The trial court held that the debtor met the minimal standard of living test despite the inclusion of these expenses, noting that while "[i]t is conceivable that [the debtor] could reduce some of the items in her budget, ... such reductions would be minimal and inconse-

quential", which result was upheld on appeal, *Rifino* at 1088. The three expenses in this case total only $96.52, which is likewise minimal and inconsequential in the context of Debtors' total expenses exceeding $5,000.

Even assuming for the sake of argument that all of Creditor's suggested reductions should be made (and the Court does not find that they should), the result under the first prong of the *Brunner* test would not change. To wit: reduce rent by $200 based on Husband's testimony about apartment rents; substantially reduce automobile operation and repair expense of $251.87 through sale and offsets by, say, $200; reduce the approximately $936 expense for food and miscellaneous supplies by some arbitrary percentage, say roughly one-third, or $300; and eliminate the approximately $100 total for the three allegedly unnecessary expenses. Those total reductions of $800 would decrease the current expenses from $4,940.76 (as adjusted to delete payment of the son's expense) to $4,140.76—Debtors' net income is $4,883, which would leave a surplus of $742.24.[11] However, that is far less than would be needed to pay the New Loans. Debtors' post-trial brief includes calculations amortizing the New Loans over a "work life" of six to ten years,[12] which show that monthly

---

**10.** The $35.85 monthly expense for outside meals and takeout amounts to about $1.20 per day for the couple, or 60¢ apiece per day for two busy professionals who are working away from home. As for newspapers, this Court is not prepared to find that they are a luxury or an expense that is not included in a minimal standard of living.

**11.** If the HEAL Loan payment rises by some $200 to $250 per month (as Husband testified it was expected to do), that increase would absorb approximately one-third of such a surplus.

**12.** Creditor does not contradict the calculations, but does dispute the assumption that

Debtors' remaining work life will be only six to ten years. However, Creditor provided no evidence of how long chiropractors generally work, whereas Husband testified without contradiction that he is aware of only one chiropractor older than he who continues to practice, and "it seems to be rare" for them to practice beyond the age of 60 due to the work's physical demands. Husband also testified that he suffers some pain and weakness that is exacerbated by his work, which requires treatment "just about daily" and "occasionally" interferes with his ability to practice.

payments would be from $753 to $529 on Husband's New Loan, and from $2,776 to $1,950 on Wife's New Loan. Accordingly, if Debtors were to retire ten years after trial in 2003 (at Husband's age 64 and Wife's age 63, in 2013), monthly payments of $2,479 ($529 plus $1,950) would be required to pay the New Loans in full by that time. The original term of Husband's New Loan was twenty-five years from January 12, 1996 (January 12, 2021, eighteen years from trial in 2003) and the original term of Wife's New Loan was twenty-three years and three months from January 9, 1994 (April 9, 2017, fourteen years from trial in 2003)—it is unclear what the balances of the terms are after forbearances and defaults, but the Court has calculated amortizations over a twenty year period (to Husband's age 74 and Wife's age 73, in 2023) and a fifteen year period (to Husband's age 69 and Wife's age 68, in 2018). The monthly payments required to pay the New Loans off in twenty years would be $376.29 for Husband and $1,385.69 for Wife, a total of $1,761.98—the monthly payments required to pay the New Loans off in fifteen years would be $424.20 for Husband and $1,562.10 for Wife, a total of $1,986.30. As set forth above, even when Debtors' budget is adjusted to reflect what Creditor considers to be a minimal standard of living, the monthly surplus is only $742.24—that is $1,019.68 less than the monthly payment needed to retire the New Loans in twenty years when Debtors are over 70, and from $1,736.76 to $1,244.06 less than the amounts required to pay them off by the time Debtors reach more typical retirement ages (at least for other professions) in their sixties within ten to fifteen years.

As discussed below, Creditor calculates that Debtors could consolidate the New Loans and Wife's HEAL Loan under the Ford Program and pay $1,496.95 per month based on current annual income of approximately $101,000 (with the payment changing if income were to change). But Debtors' budget cannot support that amount either, even when expenses are reduced as Creditor urges they should be. Debtors' current monthly expenses without the $400 HEAL Loan payment total $4,647—after deleting $106.58 for the son's expense, the total is $4,540.42—after deducting $800 for what Creditor considers to be unnecessary expenses, the total is $3,740.42. Debtors' net monthly income is $4,883, which is a surplus of $1,142.58. That surplus is $354.37 less than the monthly payment that Creditor calculates would be required to pay all three loans under the Ford Program.

█ Finally, the Court notes that Debtors' current expenses include no contributions to a retirement account or pension plan. That should be reflected in even a minimal standard of living for a middle-aged couple who lack savings.

Debtors' current income and expenses would not permit them to maintain a minimal standard of living if the New Loans, or any part of them, were repaid.

### B. Additional Circumstances

█ The second prong of the *Brunner* test requires the Debtors to show that additional circumstances exist such that the current state of affairs will persist over the life of the loan repayment period.

The "additional circumstances" prong of the *Brunner* test "is intended to effect 'the clear congressional intent exhibited in § 523(a)(8) to make the discharge of student loans more difficult than that of other non-excepted debt.'" *Rifino*, 245 F.3d at 1088–89 (citations omitted). There must be evidence that the debtor's "road to recovery is obstructed by the type of barrier that would lead [the

court] to believe he will lack the ability to repay for several years." [citation omitted]. Examples of such barriers may include psychiatric problems, lack of usable job skills and severely limited education. [citation omitted].

*Birrane,* at 497.

In this case, Debtors are not unskilled or uneducated, but the skills and education that they have do not equip them to enter different fields that are more lucrative, and their ages do not give them enough time to undertake any extensive retraining (nor would they be able to pay for it). Husband has done no other kind of work since 1986 and Wife has not since 1991; neither of them had an established career in any particular field prior to becoming chiropractors. Husband had three different occupations over a nine year period and never earned more than $2,500 gross per month—Wife had several secretarial and clerical jobs for seventeen years, and testified that she knew of no field for which she is qualified that would pay her more than she earns now; although she has an undergraduate degree in psychology, she has never worked as a psychologist and she testified without contradiction that more advanced degrees are required for employment in that field.

Not only do Debtors lack realistic prospects of better employment, but their income as chiropractors is unlikely to increase and will end whenever they retire.[13] Husband testified without contradiction that the practice now charges "pretty much what the market will bear", and Debtors increased the patient load to its current levels by such means as acquiring the practice of a retiring chiropractor and periodically offering coupons for reduced prices to attract new patients. Creditor argues that Debtors should promote the practice through public appearances, but Husband testified that he was an unsuccessful salesman in the past and "it doesn't work for me" because he is "absolutely terrible at actively promoting myself", so it appears that any such efforts would be futile. Husband testified plausibly that business conditions for chiropractic practices have declined due to restrictions imposed by the insurance and workers' compensation industries, and to a depressed local economy—he anticipates additional problems in future if licensing requirements are changed to permit increased competition. Debtors' income will drop slightly when Wife's inherited mortgage is paid off in approximately ten years and no longer generates $140 per month. It is possible that Debtors could receive some additional compensation when their corporation no longer has to pay for the practice that was purchased from the retired chiropractor; those payments were to be made for a one year period ending in May 2003 and totalled $17,000 in 2002. However, there was no evidence about what the corporation will save monthly by not making those payments, nor about what (if any) part of such savings Debtors might receive as additional income, and that information cannot be extracted from the evidence in the record. Since the one year payment period ends in the fifth month of 2003, the $17,000 paid in 2002 must have covered seven months of the total period, which is an average monthly payment of approximately $2,428—but the payments are based on a percentage of monthly revenues generated by the acquired patients during one year, and the record does not provide those figures for any part of the

---

13. And, as discussed above, at page 24, the couple has no savings and no retirement plan

whatsoever.

payment period.[14] In any event, Debtors' compensation from their corporation might be reduced in future when the sixteen year old x-ray equipment has to be replaced at a possible cost of $30,000 (although there is no evidence about how that corporate expense might affect Debtors' compensation). As noted above, Husband testified that chiropractors typically retire by age 60 due to the work's physical demands, and he already suffers some pain and weakness that occasionally interfere with his ability to treat patients. When Debtors do retire from their practice, their income is likely to decrease, since they are not qualified to earn as much as they do now even if they were to undertake some other employment.

Debtors' expenses are certain to increase at least somewhat, and possibly quite a bit. At time of trial, the non-dischargeable HEAL Loan was being paid at a temporarily reduced rate of $400 per month subject to review in one year, and Husband testified that the monthly payment would probably be raised to $600 or $700 because that is "what they wanted to begin with". Debtors' post-trial brief includes calculations amortizing the HEAL Loan over a work life of six to ten years, which show that monthly payments would be from $1,522 to $1,000. The maximum term of the HEAL loan (as extended by forbearances) is twenty-five years from 1998, *i.e.*, 2023 when Husband will be 74 and Wife will be 73—the Court has calculated amortization over the twenty year period between that date and trial in 2003, which shows that a monthly payment of $619.47 would be needed to pay the HEAL Loan in full by the end of its maximum term (assuming the current 4.25% rate of interest; the interest rate is variable). Debtors' expenses will be reduced by $246.31 per month when the automobile loan payment ceases in February 2008; but, assuming that the automobile continues to function well in five years, that reduction is almost fully offset by the minimum increase in the HEAL Loan payment (from $400 to at least $619.47)—and the reduction will not occur until February 2008, whereas the HEAL Loan increase is scheduled to occur during 2003. Moreover, if Debtors attempt to pay the HEAL Loan off by a typical retirement date within six to ten years, that monthly payment will increase from $400 to $1,522 or $1,000 and fully absorb all savings represented by cessation of the automobile loan payments. Further, Debtors have no dental insurance and their medical insurance requires them to cover co-payments and deductibles—if their health declines as they age, as the health of most people does, those expenses will necessarily rise. Finally, since Debtors have no savings or pension plan and are now in their mid-fifties, it would be prudent for them to increase expenses by adding some provision for retirement.

Whether the repayment periods for the New Loans is six to ten years or fifteen to twenty years, additional circumstances exist that cause the current state of affairs to persist throughout those repayment periods.

### C. Good Faith

■■■■■ The third prong of the *Brunner* test requires the Debtors to show that

---

**14.** The only evidence on that subject was Husband's testimony that Debtors hoped the acquired patients would "expand our referral base for the future" and "it might work out to be maybe about a 10% increase over what we were doing before". That does not show how much money the corporation will save by ceasing payments for the acquired patients, nor does it show whether or how any such savings would affect Debtors' monthly compensation from the corporation.

good faith efforts were made to repay the loan.

> Courts have measured good faith by examining various factors; the fact debtor has made no payments or has made some payments on the loan is not in and of itself dispositive. [citation omitted] (court may evaluate the debtor's conduct in the broader context of his total financial picture). "Good faith is measured by the debtor's 'efforts to obtain employment, maximize income, and minimize expenses.'" [citations omitted]; *see also Pena*, 155 F.3d at 1114 (holding that bankruptcy court did not clearly err in finding that debtor had exhibited good faith in paying back student loans where, *inter alia*, debtor used large sum disability benefits distribution to pay down portions of other debts that were approximately four times amount of student loans). "A debtor's effort—or lack thereof—to negotiate a repayment plan is an important indicator of good faith." [citation omitted].

*Birrane*, at 499.

It is undisputed that Debtors have made very significant payments on all of their several student loan obligations, including the New Loans—Husband paid a total of $52,332.17 over a nineteen year period, of which $23,346.75 was paid on his 1995 New Loan in five and a half years—Wife paid a total of $42,894.41 over a seventeen and a half year period, of which $11,243.44 was paid on her 1993 New Loan in approximately one year. Wife testified credibly and without contradiction about her belief that she had received a hardship deferment, her extensive efforts to learn the status of her New Loan and obtain an accounting to explain the increasing balance and addition of unidentified charges, and her tendering of large payments for several months despite a lack of information in response to her constant requests.

There is no question that Debtors made serious attempts to pay the New Loans over long periods of time.

As discussed above, Creditor argues that Debtors should have done more to increase income and decrease expenses. However, for the reasons set forth above, the Court does not consider that Debtors could or should have done more than they did. For example, Creditor argues that Debtors should have sought less expensive housing—but Husband testified that he deals with "an awful lot of people who talk to me all the time about the difficulty of finding affordable housing", Debtors' rent "seems the best I hear of anyone doing", and the cost of moving would be "prohibitive"—under those circumstances, it was not bad faith for Debtors to refrain from the apparently futile exercise of searching for a new home. Creditor also argues that Wife should have applied for secretarial jobs—but Wife has not done such work for over ten years and testified that she did not believe she was qualified for any field that would pay more than she was earning—it was not bad faith for Wife to refrain from seeking a job for which she considered herself unqualified.

Creditor also argues that it is bad faith for Debtors not to have made use of the Ford Program. Creditor calculates that Debtors could consolidate the New Loans and the HEAL Loan under the Ford Program and qualify for monthly payments of $1,496.95 based on their estimated 2003 adjusted gross income of approximately $101,000. Creditor notes that the payment amount would be based on income, so it would be reduced should income fall (such as upon retirement)—payments would be required for twenty-five years, but any balances that remained outstanding at that point would be forgiven. However, as set forth above, Debtors' budget would not support such a payment.

Moreover, the current state of the law is that debt forgiveness is treated as taxable income unless a taxpayer is insolvent. Debtors' post-trial brief includes calculations showing that the unpaid balances at the end of twenty-five years would be between $300,000 and $400,000—Creditor objects that those calculations are based on various assumptions about evidence that was not presented at trial (*e.g.*, Social Security benefit rates and amounts). The Court's calculations (based only on the undisputed balances of the three loans, the 7.549% interest rate under the Ford Program, and a twenty-five year term) show that a monthly payment of $2,182.01 would be required to pay the three loans in full within the term of the Ford Program. That amount is $685.06 more than the $1,496.95 monthly payment based on current annual income of $101,000, so it is obvious that some significant part of the balances would remain unpaid at the end of twenty-five years even if Debtors' income were always as high as $101,000 (which is unlikely) so as to keep the payments up to $1,496.95.[15] Twenty-five years from now, Husband will be 79 years old and Wife will be 78 years old—unless they are insolvent at that point,[16] forgiveness of any balances that were not paid under the Ford Program would constitute taxable income, at a time when Debtors are likely to be earning nothing and depending upon Social Security benefits. Creditor notes that the law may well change in the next twenty-five years, so that the Ford Program can be used without fear of tax consequences. But it would be complete speculation to consider what the law might possibly be far in the future, whereas Debtors' decision about whether to enter the Ford Program had to be made in the present. *Birrane* notes (at 500, n.7) that, even though it is "not unlikely" that adverse tax consequences may result from using the Ford Program, its availability is nevertheless "a factor to be considered" in determining whether a good faith effort was made to repay. This Court has given due consideration to that factor, but cannot find a lack of good faith in a decision to forgo the Ford Program where Debtors' budget cannot meet the payments required and, under the current state of the law, Debtors' calculations are that they will be charged with taxable income of $300,000 to $400,000 on the eve of their 80th birthdays.

## CONCLUSION

For the reasons set forth above, Debtors have established that repaying the New Loans in full would entail undue hardship. The Court has considered whether Debtors could pay any part of the New Loans without undue hardship, as provided by *Saxman*, and has concluded that they cannot, for the reasons stated herein. The New Loans are therefore dischargeable under § 523(a)(8).

Counsel for Debtors shall submit a form of judgment so providing, after review by counsel for Creditor as to form.

---

**15.** In any event, the issue in the good faith analysis is not what the unpaid balances would actually be, it is what the Debtors reasonably believed they would be.

**16.** There is no evidence from which Debtors' solvency twenty-five years in the future can be determined.