**In re Peter A. ADLER and Sherry F. Adler, Debtors.**

**Peter A. Adler, Plaintiff,**

**v.**

**Educational Credit Management Corporation, Defendant.**

**Bankruptcy No. 01–51848–ASW. Adversary No. 01–5174.**

United States Bankruptcy Court, N.D. California.

Oct. 3, 2003.

Cathleen Cooper Moran, Moran Law Group, Inc., Mountain View, CA, for Debtors.

## MEMORANDUM DECISION DETERMINING DEBT TO BE DISCHARGEABLE

ARTHUR S. WEISSBRODT, Bankruptcy Judge.

Before the Court is a complaint by Peter A. Adler ("Husband"), the debtor in this Chapter 7[1] case, against Educational Credit Management Corporation ("Creditor"). The complaint seeks a determination that a debt owed to Creditor for student loans taken by Husband is dischargeable in bankruptcy under § 523(a)(8), on the basis that payment of such debt would pose undue hardship.

Husband is represented by Cathleen Cooper Moran, Esq. of the Moran Law Group, Inc. Creditor is represented by Miriam Hiser, Esq. of the Law Offices of Miriam Hiser. The matter has been tried and submitted for decision after post-trial briefing.[2] This Memorandum Decision constitutes the Court's findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

### I.

### FACTS

Husband and his wife Sherry Adler ("Wife") filed a joint petition under Chapter 7 on April 13, 2001, and a discharge of all dischargeable debts was granted to each of them on July 9, 2001.

The parties stipulate to the following facts. Husband's debt to Creditor ("Subject Loan") arose in 1991,[3] when Husband consolidated several loans that he had previously taken to finance his masters degree and Ph.D. (which he received from the California School of Professional Psychology in 1984 and 1989, respectively). As of October 28, 2002, the amount of the Subject Loan was $86,587.46, bearing interest at the rate of 9%. The Subject Loan's original repayment term in 1991 was 25 years but Husband has received forbearances totalling three years, so the repayment term will last until 2016; monthly payments of $830.20 would be required to pay the Subject Loan in full by that time.

---

1. Unless otherwise noted, all statutory references are to Title 11, United States Code, as it provides with respect to cases filed on April 13, 2001.

2. Creditor filed a brief on December 5, 2002 and Husband filed a response on December 16, 2002, which was the extent of the briefing that was contemplated by the Court. However, Creditor filed a letter on January 2, 2003 "to correct a misstatement" in Husband's brief, followed by letters on January 22, 2003 and August 7, 2003 noting decisions published after trial. All of Creditor's letters are shown to have been served on Husband's counsel, who has filed nothing in response. The Court will accept these letters as supplemental post-trial briefs.

3. Husband testified that Wife is not a party to the Subject Loan, and that it was taken before the spouses met.

The evidence shows that Husband is also liable for a loan from the United States Department of Health and Human Services ("HHS"), which is a "health education assistance loan" ("HEAL Loan") made pursuant to 42 U.S.C. § 292 *et seq.* At time of trial, the balance was approximately $126,000 and HHS had recently agreed to accept monthly payments of $125 subject to review after one year. Annual interest of 4.25% was accruing at the rate of $489.18 per month and HHS advised Husband to pay approximately $800 per month "to start reducing your debt". There was no evidence of the HEAL Loan's commencement date or repayment term.[4]

The parties stipulated that Husband became a licensed psychologist in 1991 and has worked in that capacity ever since: from 1991 to 1995, he was director of the Psychology Department at Royal Therapeutic Residential Center in Southern California; from 1995 to 1997, he had a private practice in Southern California; from 1997 to 2000, he was a staff psychologist at Bristol Park Medical Group in Southern California; and since October 2000, he has been a staff psychologist at Children's Health Council in Palo Alto. It is further stipulated that Husband's gross annual salary has increased from $33,000 in 1996 to $72,800 at time of trial.

Husband testified that "his personal expectations" when deciding to become a psychologist were that he would earn "well over $100,000 a year", but that did not prove to be the case. After receiving his doctorate in 1989, he was required to undertake additional training for a year and a half in order to secure a license, during which time he was paid $16 an hour. Once he received his license, he earned "somewhere in the range of" $23 to $24 an hour. While working full time at his first job, he opened two part-time private practices for additional income so that he could repay his student loans. In 1995, he commenced a full-time private practice with two offices but it was not financially successful due to restrictions imposed by the insurance industry: most patient referrals were made to doctors who were members of established industry "panels", which were closed to new members; insurers offered only limited payments for services; and payments were withheld for up to six months. During that period, Husband sought forbearance on his student loans based on financial hardship, which was granted. Husband and Wife eventually moved into a small room with Wife's mother because they could not afford to pay rent—the room had only a twin bed, which the spouses took turns using, and Husband stated "I kept those [student loan] payments going even though I was sleeping on the floor and did not have my own home any more." Husband testified that he inquired about the National Health Service Corps, a student loan forgiveness program under which doctors are assigned to work in locations where their services are re-

4. The parties did not formally stipulate that the HEAL Loan is non-dischargeable in bankruptcy and there was no evidence on the issue, but Husband's attorney consistently took that position in argument without dispute from Creditor's counsel. HEAL Loans are dischargeable in bankruptcy only if all three conditions of § 292f(g) are met: "such discharge is granted—(1) after the expiration of the seven-year period beginning on the first date when repayment of such loan is re-

quired, exclusive of any period after such date in which the obligation to pay installments on the loan is suspended; (2) upon a finding by the Bankruptcy Court that the nondischarge of such debt would be unconscionable; and (3) upon the condition that the Secretary shall not have waived the Secretary's rights to apply subsection (f) of this section [permitting offset of certain federal benefits against unpaid HEAL Loan balances] to the borrower and the discharged debt."

quired. However, he found that most positions were assigned to physicians and nurse practitioners, with "very few" available for psychologists. He could not serve in other states because he was licensed only to practice in California, and the one position in California was filled. He explored the possibility of establishing a location himself, but "the process appeared to be far too difficult". In 2000, while working as a staff psychologist for a medical group, Husband took on a second job as a salesman but was unable to make any sales. The couple moved from Southern California to the San Jose area in October 2000 and, at time of the trial, Husband was employed by the Children's Health Council. He testified that salaries there "compete" with those at "similar places", but he had been told there would be no increase during that fiscal year. He stated that, as a senior staff psychologist, he was "at the top" of the salary range and could not advance unless a management position were to become available to him; as to that possibility, he said "I do not know if there were to be a management position open up, whether I would be up for that type of position or not". Husband testified that opening a private practice could generate more income, but he lacked funds with which to pay for malpractice insurance and was not familiar with all financial aspects of starting a new business. Husband said that his salary had doubled when the couple moved north, but the higher cost of living in the San Jose area "negated any improvement in the cash flow".

Husband testified that his monthly take-home pay at time of trial was $4,022, and that average monthly expenses totalled $3,844.74, as follows:

| | |
|---|---|
| Rent | $1,800.00 |
| Utilities | $ 80.00 |
| Automobile insurance | $ 96.00 |
| Automobile payment | $ 240.21 |
| Telephone | $ 62.00 |
| Gasoline | $ 72.00 |
| Trainfare | $ 75.00 |
| Pet expense | $ 7.00 |
| Automobile repair | $ 21.00 |
| Dry cleaning | $ 8.90 |
| Medical and dental | $ 150.00 |
| Food | $ 931.00 |
| Household items | $ 176.73 |
| HEAL Loan payment | $ 125.00 |

With respect to the automobile expenses, Husband testified that the couple own a 2001 Geo Prizm and a 1990 Mitsubishi Mirage. He said that the latter is "at its last leg" but not worth repairing, and cannot be driven more than two miles without engine malfunction. Husband drives the Geo one hundred miles to and from work twice a week, and drives the Mitsubishi to the train station the rest of the week.

Insofar as the medical expenses are concerned, Husband testified that the couple are members of an insurance plan under which they would pay only $10 for each doctor's visit, but Wife used an "out of network provider" who charged $150 per visit and that was not covered by insurance. Wife testified that she suffered an automobile accident in 1996, had a hysterectomy in 2001, and would soon require more surgery. Surgery is covered by the insurance plan, but Wife was dissatisfied with the non-surgical treatment she received from the various doctors who were available under the plan and considered their approach harmful, so she was consulting instead "a licensed regular doctor" with a certification in "holistic medicine". Husband testified that the doctor recommended more frequent visits but Wife can only afford half sessions once a month, and the thyroid medication he prescribes for her is not covered by insurance. Wife testified that she also required "a lot" of dental work, and that only "extremely limited" insurance coverage is provided for that.

As for the food expense, Husband testified that it includes items needed by Wife, such as vitamins and food supplements at $30 to $40 per month, and yeast-free and wheat-free bread at $5 per loaf. Wife testified that her doctor had prescribed vitamins and "things like that".

Concerning the expense for household items, Husband testified that it includes toilet paper, paper towels, garbage bags, paper plates, plastic folks, soap, cleaning fluids and the like. He said that Wife has been too weak to wash dishes, and Husband is too tired to do so after a twelve-hour workday, so it is necessary to buy disposable paper and plastic supplies.

Husband testified that "basically five years ago I was living paycheck to paycheck, I am still living paycheck to paycheck". He said that the couple had been sleeping on $25 inflatable camping mattresses until they purchased "the cheapest twin mattresses", which hurt their backs. Husband said that the only clothes the couple bought in the past two years was underwear and a pair of shoes, Wife had two pairs of pants, and Husband was still using the same four pairs of "dress pants" and "dress shirts" that he purchased in 1999. Husband testified that he owns "some furniture" but neither spouse has a cell phone or pager. Husband said that he had $147 in savings, between $7,000 and $8,000 in a 401K retirement plan from a previous employer, $1,500 in contributions by his current employer to a retirement fund, and Wife had approximately $2,000 in an Individual Retirement Account. Husband testified that the couple accumulated some $38,000 in credit card debt while student loan payments were being made, which has now been discharged in bankruptcy. He said that they no longer have any credit cards to serve as a "buffer" when unusual expenses arise, such as needing new tires for the automobiles

(which he expects to occur)—"we have absolutely no back up or savings if these types of expenses hit" and "we are already on a shoe string, if any thing remotely extraordinary turns up we will not be able to handle it, let alone the student loan payment".

Wife testified that she does not work and is unable to do so. She said that she has a bachelor's degree in art history and a masters degree in social work. After graduating from college, she worked as an interior designer for "a year or so", as a graphic designer for "probably less than two years", and as a clinical social worker "for a while". She had two separate contract positions in 1999 for "about three to four months apiece", which were "almost like full time positions". Her earnings ranged from $35 an hour for "pure technical writing" to $15 an hour for a two day contract position in 2000, which was her last employment. Wife stated that she was unable to find a permanent position despite "extremely intensive efforts" in 1999 and 2000, such as attending conventions and "tech fairs", contacting "a lot" of agencies, and sending out "a lot" of resumes. She said that her master's degree in social work did not qualify her for employment in that field because, although she had once held a temporary license, she lacked the necessary permanent license. She had taken the license examination and passed the written part but failed the oral part—she did not make a second attempt because the test was "expensive", she had been unable to find employment even when she had a temporary license, and the license had to be obtained within a limited period of time after graduating. Wife testified that, commencing in early 2001, she "got really really sick" and had a hysterectomy in March; thereafter, she has "hardly left the bed" and has been unable to look for work. She also testified that, since the automobile accident in 1996, she has

had difficulty sitting or standing for prolonged periods and suffers from reduced strength and mobility. She has not received any physical therapy since moving north in October 2000 because her experience has been that the "cold pack" treatment offered under the insurance plan does not help and could make her condition worse. Wife described her symptoms as including hair loss, "extreme" fatigue, joint pain, "what is called technically brain fog, which is when your brain is not working right", and weight loss of eight or nine pounds. She stated that, although she is "basically unable to work", she is not eligible for disability benefits because Husband's income is too high and she never made sufficient contributions to qualify.

Husband testified that his student loan debts have had a "profoundly devastating impact on the marriage", and said that he did not know whether his wife "will ever recover from it". Wife testified that the debts have "completely impoverished us", the couple could never afford to buy a house or have children or enjoy "simple things like vacations", and "we will never have a normal life" after having "sacrificed everything we have got".

Husband testified that a total of $44,000 has been paid on all of his student loans since 1988, but he did not know how much of that had been paid on the Subject Loan.

The parties stipulate that Husband is eligible for participation in the William D. Ford Program ("Ford Program"). The Ford Program offers various repayment plans, including an "income contingent repayment plan" that determines the monthly payment amount based on income. The parties agree that the monthly payment based on Husband's 2000 adjusted gross income of $64,728 would be $885.30, whether Husband used the Ford Program only for the Subject Loan, or only for the HEAL Loan, or chose to consolidate both.

The maximum repayment term under the Ford Program is twenty-five years and any balance remaining unpaid at the end of that term is forgiven. It is undisputed that debt forgiveness constitutes taxable income pursuant to 26 U.S.C. § 61(a)(12), unless the taxpayer is insolvent pursuant to 28 U.S.C. § 108(a)(1)(B).

There is no evidence of Husband's age, though his attorney stated in argument without contradiction that he was 49 years old at time of trial. The only evidence of Wife's age is her testimony that "now we are like old, we are like fifty years old".

Husband introduced into evidence the Internal Revenue Service ("IRS") Collection Standards, which set forth amounts that IRS considers necessary for support before a delinquent taxpayer's excess income is subject to collection. For a couple with Husband's gross income, those standards provide the following monthly amounts, totalling $3,282:

| | |
|---|---|
| Food, housekeeping supplies, clothing, personal care, miscellaneous expenses: | $1,235. |
| Housing, utilities: | $1,649. |
| Transportation: | $ 398. |
| Health care, insurance, recreation, professional education, etc.: | case by case basis |

## II.

### APPLICABLE LAW

Bankruptcy Code § 523(a)(8) provides that student loans such as that at issue here are excepted from a Chapter 7 bankruptcy discharge unless the debtor shows that "excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents". Husband claims that he and Wife would suffer undue hardship if the debt to Creditor had to be repaid.

The Code does not define "undue hardship", but the Ninth Circuit has adopted the three-part test of *In re Brunner*, 46 B.R. 752 (S.D.N.Y.1985), *aff'd*, 831 F.2d 395 (2nd Cir.1987) (*"Brunner"*) to

determine whether "undue hardship" exists, *see In re Pena*, 155 F.3d 1108 (9th Cir.1998) (*"Pena"*). That test requires a debtor to prove each of the following:

> First, the debtor must establish "that she cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependents if forced to repay the loans." [Citation omitted] ....
>
> Second, the debtor must show "that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans." [Citation omitted] ....
>
> The third prong requires "that the debtor has made good faith efforts to repay the loans...." [Citation omitted] ....

*Pena*, at 1112.

■ When a debtor proves all three parts of the test and thus shows that undue hardship would result from having to pay the entire loan, it may nevertheless be the case that paying only part of the loan would not impose undue hardship. In that event, the loan can be partially discharged, *see In re Saxman*, 325 F.3d 1168, 1173–74 (9th Cir.2003):

> ... once the debtor has satisfied the *Brunner* factors and the court has concluded that the debt is too great for the debtor to shoulder, § 523(a)(8) is silent with respect to whether the bankruptcy court may partially discharge the loan. Although § 523(a)(8) is the sole mechanism by which debtors may seek discharge of student debt, it is not the only provision bearing on the dischargeability of student loans. [¶] Following [*In re Myrvang*, 232 F.3d 1116 (9th Cir.2000)], it is now generally recognized that an all-or-nothing approach to the dischargeability of student debt contravenes Congress' intent in granting bankruptcy courts equitable authority to enforce the

provisions of the Bankruptcy Code. [footnote omitted] Under 11 U.S.C. § 105(a), bankruptcy courts may "issue any order, process or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. In [*In re Hornsby*, 144 F.3d 433 (6th Cir.1998) (*"Hornsby"*)], the Sixth Circuit held that § 105(a) authorizes bankruptcy courts to enter partial discharges in student loan cases.

The Ninth Circuit endorsed *Hornsby's* application of § 105(a) to permit partial discharge, but disagreed with that case's failure to require a finding of undue hardship with respect to the discharged portion of a loan.

> We therefore conclude that before the bankruptcy court can partially discharge student debt pursuant to § 105(a), it must first find that the portion being discharged satisfies the requirements under § 523(a)(8).

*Saxman*, at 1175.

### III.

### ANALYSIS

#### A. Minimal Standard of Living

■ The first prong of the *Brunner* test requires Husband to show that, based on current income and expenses, he and Wife cannot maintain a minimal standard of living if the debt to Creditor had to be repaid.

To meet this requirement, the debtor must demonstrate more than simply tight finances. In defining undue hardship, courts require more than temporary financial adversity, but typically stop short of utter hopelessness. The proper inquiry is whether it would be "unconscionable" to require the debtor to take steps to earn more income or reduce her expenses. *In re Nascimen-*

*to*, 241 B.R. 440, 445 (9th Cir. BAP 1999) (citations omitted).

*In re Birrane*, 287 B.R. 490, 495 (9th Cir. BAP 2002) (*"Birrane"*). The term "minimal standard of living" is not defined by the Code or caselaw and there was no evidence at trial concerning a local norm. As noted above, Husband did introduce into evidence the IRS Collection Standards, but Creditor argues that those are irrelevant and caselaw does not apply them. As a matter of law, it is true that the IRS Collection Standards have not been held to constitute a "minimal standard of living" for purposes of § 523(a)(8). Insofar as factual issues are concerned, the Court finds the IRS Collection Standards to be of limited usefulness because they do not explain the assumptions upon which they are based, do not adjust all amounts for local variances, and do not address such essential items as health care, insurance, and retirement at all.

At time of trial, Husband's net monthly income was $4,022 and monthly expenses totalled $3,844.74. There appears to be a surplus of $178.26, but that is illusory because the budget is not realistic. For example, there is no provision for clothing, although Husband's testimony showed that both spouses require new clothing. Further, the 1990 automobile is barely functioning and beyond repair, so a reasonable budget would include the cost of replacing it (which would probably increase the insurance expense). Significantly, the budget does not provide for contributions to a pension plan, although the couple is middle-aged and has only some $11,000 set aside for retirement.

Creditor argues that the medical and grocery expenses are too high because Wife consults a doctor whose services are not covered by insurance and the couple buys expensive bread. However, Wife testified that she selected her doctor because she was not satisfied with the treatment she received from the doctors offered by the insurance plan, and the bread appears to be used for health reasons rather than as a luxury. Even assuming for the sake of argument that those expenses should be reduced, the budget would still be unrealistic with respect to clothing, transportation, and retirement. If the $150 medical expense were replaced by one $10 visit to a doctor provided by the insurance plan, that would save $140 per month; if the grocery expense were reduced by one $5 loaf of bread a week (for which a $1.50 loaf of bread was substituted), that would save approximately $14 per month—those savings of $146 would reduce total monthly expenses to $3,670, for a surplus of $324 per month (approximately $70 per week). That surplus would have to cover clothing for two adults (one of them a professional man), replacement of the 1990 automobile, and retirement savings for a couple with approximately fifteen more years to work and only $11,000 set aside now.

Furthermore, reduction of those expenses would not permit payment of the Subject Loan. In order for the Subject Loan to be paid in full by the end of its seventeen year term, $830.20 per month is needed—if the Subject Loan were included in the Ford Program, either alone or consolidated with the HEAL Loan, monthly payments of $885.30 would be required based on Husband's current income. Even if expenses were reduced as Creditor urges, the resulting monthly surplus would be only $324 (or $422 if the $125 HEAL Loan payment were eliminated by consolidation under the Ford Program), which is approximately half of what would be needed to pay the Subject Loans.

Based on current income and expenses, Husband and Wife could not maintain a minimal standard of living if the Subject Loan were repaid, either in full or in part.

## B. *Additional Circumstances*

█ The second prong of the *Brunner* test requires Husband to show that additional circumstances exist such that the current state of affairs will persist over the life of the loan repayment period.

> The "additional circumstances" prong of the *Brunner* test "is intended to effect 'the clear congressional intent exhibited in § 523(a)(8) to make the discharge of student loans more difficult than that of other non-excepted debt.'" *[In re] Rifino*, 245 F.3d [1083] at 1088–89 [(9th Cir.2001)] (citations omitted). There must be evidence that the debtor's "road to recovery is obstructed by the type of barrier that would lead [the court] to believe he will lack the ability to repay for several years." [citation omitted]. Examples of such barriers may include psychiatric problems, lack of usable job skills and severely limited education. [Citation omitted].

*Birrane*, at 497.

Husband testified that he currently earns more than he ever did before, his salary is comparable to those at similar institutions, he is at the top of his salary range, he has no prospects for advancement unless he were offered a management position (which is beyond his control), and he cannot afford to establish a private practice. He has been a practicing psychologist since 1991 and is now middle-aged—there is no evidence that he has either education or experience that qualify him for work in some more lucrative field.[5]

█ Creditor argues that Wife should become employed so as to increase the couple's income. It is undisputed that all family or household income must be included when assessing undue hardship under § 523(a)(8), *see Pena; see also In re White*, 243 B.R. 498, 509, n. 9 (Bankr. N.D.Ala.1999), cited by Creditor and collecting cases. Creditor also urges that Wife's claimed inability to work should be disregarded because it was not corroborated by evidence such as expert medical testimony, citing *Pena*. In *Pena*, the wife offered corroborating evidence of chronic mental illness by showing that she had qualified to receive past and future benefits based on such a disability, but the case does not stand for the proposition that uncorroborated claims have no merit.[6] Without expert medical evidence, this Court is not competent to determine whether Wife suffers from a medical disability—but this Court is capable of evaluating Wife's credibility as a witness, and has concluded that Wife sincerely believes that she is too ill to work. Given her own perception that she is not able to work, it follows that she cannot work; even if her disability were a psychosomatic one, it would be no less real in its effects. Furthermore, it appeared from Wife's demeanor at trial that she is a tense, emotional, and nervous person who is easily distracted and quickly fatigued. Such qualities are not conducive to retaining a job even if she were able to find one, and her failure to obtain a permanent position despite two years' "extremely intensive" efforts shows that she has not been readily employable (for whatever reason). Credi-

---

5. The only evidence that Husband has ever done any other kind of work is his testimony that he took a second job as a salesman for a time, but made no sales.

6. In this case, there is no basis upon which to draw negative inferences from the lack of corroboration. Husband's attorney stated in argument that Husband would have retained an expert medical witness if he had been able to afford it. Wife testified that she was ineligible for disability benefits due to Husband's income and her own earnings history, so the absence of benefits does not reflect a lack of disability.

tor contends that Wife has not availed herself of treatment for her current condition, because she has not sought physical therapy since 2000 and is relying on holistic medicine instead of consulting the doctors provided by the insurance plan. However, Wife credibly testified that she has not benefitted from traditional treatment in the past and believes it would harm her—whether her opinion is or is not medically justified, it appears to be a sincerely held and firm one, and she cannot reasonably be expected to submit to treatments in which she has no confidence (and in fact considers harmful).

Assuming for the sake of argument that Wife were able to obtain employment, the evidence does not suggest that she could earn much. Her work experience as a technical writer and graphic designer did not result in her finding a job during her "extremely intensive" search in 1999 and 2000, and her degree in social work is useless without the license that she has been unable to acquire, cannot now afford, and may now be unqualified for. She has earned from $35 to $15 per hour at various times in the past but has not worked since 2000, which was prior to her surgery in 2001. At time of trial, she said that she had "hardly left the bed" since the surgery, and Husband testified that she was too weak to wash dishes; furthermore, as noted above, her behavior tends to be erratic. Under all of these circumstances, it is not probable that she would earn anywhere near as much as she did in the past; if she were employable at all, it is more likely than not that she would be confined to low paying positions on a part-time basis. If she were qualified for a job paying the current California minimum wage of $6.75 per hour[7] and worked twenty hours a week, her gross earnings would be only $135 per week, or approximately $540 per month. That would have to be reduced by any payroll taxes withheld, and the couple's expenses would have to be increased to provide for employment-related clothing, transportation, and the like. As explained following, any nominal additional income that Wife might conceivably be able to produce in future would not permit payment of the Subject Loan, in full or in part.

As set forth above, income now exceeds expenses by only $178.26 per month, and that is based on an unrealistic budget that does not provide for currently needed items such as clothing, automobile replacement, and retirement savings. Even that tiny (albeit illusory) surplus will vanish when the HEAL Loan payments rise from their current temporary level of $125 to the $800 or more that HHS advises will be needed "to start reducing your debt". At that point, expenses would increase by at least $675, absorb the illusory surplus of $178.26, and exceed income by approximately $495. If the expenses were adjusted to provide for the necessities of clothing, transportation, and retirement savings (as the Court considers they should be), the deficit would increase. If the expenses were reduced by $146 to eliminate uninsured medical treatment and expensive bread (which reduction the Court does not consider warranted), a significant deficit would continue to exist. Under these circumstances, minor contributions that Wife might someday be able to make are not likely to create a surplus from which any amount could be paid on the Subject Loan, let alone the $830.20 per month required to pay it in full by the end of its seventeen year contractual term, or the $885.30 per month (based on current income) that would be required for twenty-five years under the Ford Program.

7. The current federal minimum wage is $5.15 per hour.

Whether the repayment period for the Subject Loan is seventeen years or twenty-five years, additional circumstances exist that cause the current state of affairs to persist throughout the repayment period.

### C. Good Faith

■■■ The third prong of the *Brunner* test requires Husband to show that good faith efforts were made to repay the loan.

Courts have measured good faith by examining various factors; the fact debtor has made no payments or has made some payments on the loan is not in and of itself dispositive. [citation omitted] (court may evaluate the debtor's conduct in the broader context of his total financial picture). "Good faith is measured by the debtor's 'efforts to obtain employment, maximize income, and minimize expenses.'" [citations omitted]; *see also Pena*, 155 F.3d at 1114 (holding that bankruptcy court did not clearly err in finding that debtor had exhibited good faith in paying back student loans where, *inter alia*, debtor used large sum disability benefits distribution to pay down portions of other debts that were approximately four times amount of student loans). "A debtor's effort—or lack thereof—to negotiate a repayment plan is an important indicator of good faith." [Citation omitted].

*Birrane*, at 499.

Husband has made a serious effort to repay. He testified that he has paid a total of $44,000 on all of his student loan since 1988, though he was not certain how much of that total was applied to the Subject Loan. He recounted how he maintained payments even under adverse conditions, while sleeping on the floor in a relative's spare bedroom because he could not afford rent or furniture.

Husband has attempted to increase income. He explained his efforts to participate in a government service program, establish a private practice, and even pursue a second job as a salesman, all without success. Wife described her "extremely intensive" efforts to increase her earnings until she became unable to work.

Husband has also attempted to minimize expenses. He stated that the couple has been "living paycheck to paycheck" for years and described their budget as "a shoe string". They are saving nothing, have bought virtually no clothing in two years, were sleeping on air mattresses until changing to inexpensive mattresses that are uncomfortable, have no amenities such as cable television and cell phones, and are using an automobile that cannot be driven more than two miles at a time.

With respect to the Ford Program, it is undisputed that Husband could use it for the Subject Loan, or the HEAL Loan, or both; under the income contingent repayment plan, monthly payments would be based on income regardless of the total amount of the loan or loans.[8] But it is also undisputed that, under the current state of the law, any balances left unpaid at the end of the maximum twenty-five year term would be forgiven and treated as taxable income. Husband calculates that, if 25% of the Subject Loan could be repaid under the Ford Program, some $64,940 would remain to be forgiven and taxed as income—if the tax rate were 28%, the tax would amount to $18,183. If the HEAL Loan were also included in the Ford Program and also remained unpaid at the end

---

8. As discussed above, Husband's budget cannot support the $885.30 monthly payments that the Ford Program would require for any loan or loans based on current income, so the issue of whether the Ford Program should or should not be used is to some extent academic.

of the term, that balance would likewise be treated as taxable income. Creditor argues that the law may well change in the next twenty-five years, so that the Ford Program can be used without fear of tax consequences. But it would be complete speculation to consider what the law might possibly be far in the future, whereas Husband's decision about whether to enter the Ford Program must be made in the present. *Birrane* notes (at 500, n. 7) that, even though it is "not unlikely" that adverse tax consequences may result from using the Ford Program, its availability is nevertheless "a factor to be considered" in determining whether a good faith effort was made to repay. This Court has given due consideration to that factor, but cannot find a lack of good faith in a decision to forgo the Ford Program under the circumstances of this case. In the first place, Husband's budget cannot meet the payments required. Even if it could, the current state of the law is such that he will face a tax bill that he calculates at $18,000 or more when he is 74 years old and likely to be retired with even less income than he has now.

### CONCLUSION

■ For the reasons set forth above, Husband has established that repaying the Subject Loan in full would entail undue hardship. The Court has considered whether Husband could pay any part of the Subject Loan without undue hardship, as provided by *Saxman,* and has concluded that he cannot, for the reasons stated herein. The Subject Loan is therefore dischargeable under § 523(a)(8).

Counsel for Husband shall submit a form of judgment so providing, after review by counsel for Creditor as to form.