PAPPAS, Bankruptcy Judge,
Concurring.
Given the bankruptcy court’s fact findings regarding Debtor’s dismal financial history and circumstances, and applying a de novo standard of review, I concur that the bankruptcy court erred in declining to grant a hardship discharge of the student loan debt to Debtor under § 523(a)(8). However, because I understand how the bankruptcy court felt restricted by precedent in reaching its decision, I write separately to highlight that the analysis required by Pena/Brunner to determine the existence of an undue hardship is too narrow, no longer reflects reality, and should be revised by the Ninth Circuit when it has the opportunity to do so. Put simply, in this era, bankruptcy courts should be free to consider the totality of a debtor’s circumstances in deciding whether a discharge of student loan debt for undue hardship is warranted.
Congress has never defined the circumstances constituting the sort of undue hardship justifying the discharge of an educational debt under § 523(a)(8), apparently preferring that bankruptcy courts craft a working definition. While it might have been appropriate and helpful when adopted, respectfully, the Brunner test for determining undue hardship is truly a relic of times long gone.
Brunner was decided by the Second Circuit in 1987 to implement the original student loan hardship discharge exception included in a still-new Bankruptcy Code. Brunner v. N.Y. State Higher Educ. Serv. Corp., 831 F.2d 395, 396 (2d Cir.1987). That early version of § 523(a)(8) provided that a debtor’s student loan debt could not be discharged unless either it first became due five years before the date of the bankruptcy filing or excepting such debt from discharge would impose an undue hardship on the debtor and the debtor’s dependents. Importantly, in those days, without regard to the debtor’s current finances, if a stu *921 dent loan had not been collected within the five years after it became due, Congress directed that it would be discharged in the student’s bankruptcy case.
Brunner typified the sort of student loan discharge cases encountered by bankruptcy courts at that time. The debtor sought to discharge $9,000 in student loans in a bankruptcy case filed just a few months after she obtained her master’s degree, immediately after the grace period before payments became due expired, after only a few months of unemployment, and having made no efforts to pay anything on the loans. Brunner v. N.Y. State Higher Educ. Serv. Corp. (In re Brunner), 46 B.R. 752, 753 (S.D.N.Y.1985), aff'd, 831 F.2d 395 (2d Cir.1987). Not surprisingly, in addition to articulating its now-famous “test,” the Brunner court held that the debtor had not made a case for an undue hardship discharge in part because, given her circumstances, she had not made a good faith effort to repay the modest debt. 831 F.2d at 396-97.
In 1990, Congress amended § 523(a)(8), significantly expanding the discharge exception to apply to more than just educational “loans” to include any “educational benefit, scholarship, or stipend payment.” Crime Control Act of 1990, Pub.L. No. 101-647 (1990). The discharge exception was further widened to encompass any obligation “that first became due more than 7 years (exclusive of any extension of the repayment period) before the date of filing of the [bankruptcy] petition.” Id. This was the version of the Code applied by the Ninth Circuit when it adopted the Brunner test for undue hardship in In re Pena in 1998. United Student Aid Funds, Inc. v. Pena (In re Pena), 155 F.3d 1108, 1112 (9th Cir.1998).
In In re Pena, the court affirmed the grant of a hardship discharge of the debt- or’s $9,300 in student loans used to acquire technical training that the court described as “useless” to him in obtaining employment. 155 F.3d at 1110. Moreover, Mrs. Pena suffered from a chronic mental disability, the debtors’ income was inadequate to pay their normal living expenses, and there was no evidence that their situation would improve in the future. Under these facts, and applying the Brunner factors (or any other test, for that matter), the decision to grant the debtors a hardship discharge of the student loans is certainly defensible.
Over the years, Congress made more changes to § 523(a)(8), all excepting a broader array of educational obligations from discharge in bankruptcy. For example, in 1998, Congress did away with the requirement that only those student loan debts that were less than seven years into the repayment period could be excepted from discharge in bankruptcy. See Higher Education Amendments of 1998, Pub.L. No. 105-244, § 971(a) (1998). Under this amendment, student-debtors could no longer hope to discharge even the oldest of their educational obligations without demonstrating that repayment would constitute an undue hardship to them or their dependents.
Most recently, in 2005, under pressure from lenders and lobbyists, Congress expanded the discharge exception to include, for the first time, private student loans. Given the geometric increases in the amount of new and outstanding educational loans, this change to § 523(a)(8) meant that the pool of potentially nondischargeable education-related debts was now a truly huge one.
As can be seen, while at one time bankruptcy courts were required to focus on a debtor’s circumstances only during the five to seven years after student loans became due, after 1998, the relevant time for examining whether a debtor had made good *922 faith efforts to repay a student loan had no limits. And after the 2005 amendment, the number and kinds of student loan debts potentially excepted from discharge skyrocketed.
In addition to these significant changes in the statutory landscape, educational borrowing has also changed drastically since the Brunner test was formulated and In re Pena adopted it. Back then, bankruptcy courts only infrequently dealt with student loan discharge issues, and as shown by the facts of those cases, the amounts in controversy were usually modest. As a practical matter, if a student loan was excepted from discharge, the debtor could be expected to repay it within a reasonable time.
But things are different now. Unlike the loans made mostly to traditional students by local banks and colleges in the 1970s, today, a variety of lenders now compete to provide “financial assistance” for a broad assortment of study and training, without regard to the wisdom of a student’s decision to borrow or their particular circumstances, and with nary a thought given to the borrower’s ability to repay the debts. Today, facing the mammoth costs of a modern education, nearly all students must borrow heavily to finance their futures. Much of that student loan debt is not incurred to finance a traditional college education, but instead goes to pay for other types of training, frequently delivered by “for-profit” companies, which may not significantly improve the debtor’s chances for employment or substantial earnings. Astoundingly, today there is nearly $1 trillion in outstanding educational debt, see Donghoon Lee, Household Debt and Credit: Student Debt at 2 (Federal Reserve Bank of New York, Feb. 28, 2013), http:// newyorkfed.org/newsevents/ mediaadvisory/2013/Lee022813.pdf; the average student loan balance is close to $25,000, Id. at 7; and over 12 percent of borrowers owe $50,000 or more. Id. at 6. On the heels of a record recession with high unemployment, it is not surprising that many of the students who borrowed to finance their education and training did not complete those programs. It is also hardly surprising that the proportion of student loans that are delinquent is at near-record high levels. Id. at 11 and 15 (explaining that 17 percent of borrowers in repayment programs are ninety-plus days delinquent).
As with the debtor in this appeal, many outstanding student loan debts are now decades old, owed by borrowers who never really had the ability to make substantial payments on the balances. Id. at 4 (noting that 34 percent of all student loans are 40 years old or older). And so, with accruing interest, those loan balances grow large. It is also increasingly common that the debtor seeking bankruptcy relief from student loan debt is not the student but, instead, a family member or friend who agreed to co-sign or guarantee the loans.
Unlike in Brunner and Pena, today, bankruptcy courts must frequently attempt to predict a debtor’s potential to repay a six-digit educational obligation over his or her entire lifetime. In many of those cases, the benefit the debtor received from the education or training financed with these “loans” may be marginal, and the balances due to creditors exceed the debtor’s debt-service abilities. It would seem that in this new, different environment, in determining whether repayment of a student loan constitutes an undue hardship, a bankruptcy court should be afforded flexibility to consider all relevant facts about the debtor and the subject loans. But Brunner does not allow it. In addition to requiring that a debtor demonstrate a current inability to pay a student loan while maintaining a minimal standard of living, Brunner man *923 dates that the debtor show “additional circumstances” to prove that his or, her impecunious status will persist into the future. Brunner, 831 F.2d at 396; Pena, 155 F.3d at 1111. Requiring that a debt- or demonstrate that his or her financial prospects are forever hopeless is an unrealistic standard.
Brunner’s additional requirement that a debtor show that he or she has made “good faith efforts” to repay a student loan is also of little utility in determining true undue hardship. Of course, as a matter of statutory construction, this “prong” of the test lacks any textual basis in the Bankruptcy Code. As a practical matter, requiring a debtor to clear this hurdle can condemn the student-borrower to a lifetime of burdensome debt under one or more of the creditors’ long-term repayment programs, some of which may span thirty-to-forty years. This aspect of the Brunner test also fails to account for the potentially devastating debt-forgiveness tax consequences to the debtor resulting from the “successful” completion of such a program, which is one reason that the repayment programs are not that popular with borrowers. At bottom, requiring debtors to participate in these creditor programs as a condition to obtaining a bankruptcy discharge simply means that creditors, not bankruptcy judges, will decide which loans can be repaid, and which should properly be forgiven. This is surely not what Congress intended in enacting § 523(a)(8).
The Ninth Circuit should reconsider its adherence to Brunner. It should instead, like a few other courts,[17] craft an undue hardship standard that allows bankruptcy courts to consider all the relevant facts and circumstances on a case-by-case basis to decide, simply, can the debtor currently, or in the near-future, afford to repay the student loan debt while maintaining an appropriate standard of living. This approach could allow the bankruptcy court, after weighing the facts of each case, to decide that a student-debtor, whose debt financed training that did not allow him or her to achieve any significant earnings, to discharge a large loan balance even in the absence of a debilitating illness or handicap. It could allow an elderly debtor to escape the burden of decades-old student loans when her prospects for repayment have disappeared, even though the debtor has not participated in a repayment plan with the creditor. And this hardship test would focus on the contemporary world of student loan debt, not circumstances that existed thirty or more years ago.
As America’s experience in the recent “mortgage crisis” should have taught us, employing an undue hardship discharge test that requires those who cannot repay educational loans, most of which are government-backed, to attempt to do so creates problems for all. Under § 523(a)(8), Congress did not draw bright lines, but instead presumably intended that bankruptcy courts have the flexibility to make fact-based decisions in individual cases about the need for student loan debt relief. Pena/Brunner restricts the bankruptcy courts’ ability to do so, and its application in the Ninth Circuit should be reconsidered.

. To be sure, Brunner still predominates in the circuits as the go-to test for assessing undue hardship. The advantages to the more timely and enlightened "totality of circumstances" approach is explained in the First Circuit BAP's decision in Bronsdon v. Educ. Credit Mgmt. Corp. (In re Bronsdon), 435 B.R. 791 (1st Cir. BAP 2010); see also Long v. Educational Credit Mgmt. Corp. (In re Long), 322 F.3d 549, 554 (8th Cir.2003) (observing that “fairness and equity require each undue hardship case to be examined on the unique facts and circumstances that surround the particular bankruptcy [case].”).